Mohinder S. GOOMAR, Plaintiff,

v.

The CENTENNIAL LIFE INSURANCE COMPANY; Sentry Life Insurance Company, Defendants.

Civ. No. 93–0672–G/R(CM).

United States District Court, S.D. California.

March 8, 1994.

Robert D. Shoecraft and Patrick L. Prindle, Duckor & Spradling, San Diego, CA, for plaintiff.

Robert H. Roe, Luce, Forward, Hamilton & Scripps, San Diego, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RHOADES, District Judge.

This case is before me on both plaintiff's and defendants' cross motions for summary judgment. For the reasons given below, defendants' motion is granted, and plaintiff's motion is denied.[1]

### SUMMARY OF DECISION

The court grants defendants' motion for summary judgment and denies plaintiff's motion for summary judgment. To be eligible for benefits under both the Centennial Life Policy and the Sentry Life Policy, a claimant must: (1) be totally disabled, such that claimant is unable to perform the material and substantial duties of his current occupation; (2) receive the regular care and attendance of a physician; and (3) submit a proof of loss within one year of the loss, unless claimant is mentally incompetent. Plaintiff has failed to satisfy any of these criteria. Accordingly, defendants Centennial Life and Sentry Life are entitled to summary judgment in their favor on all issues raised in plaintiff's Complaint.

### FACTS

This action involves claims for disability benefits submitted to two separate insurance companies in 1992: Centennial Life Insurance Company and Sentry Life Insurance Company. Plaintiff Mohinder Goomar contends that a psychological disability (visions of astral beings) caused him to sexually molest four female patients during the time period from 1980 to 1984, while he was in private medical practice in Saratoga Springs, New York. The molestations resulted in public hearings before the Regents Review

---

**1.** Pursuant to Southern District of California Local Rule 7.1(d)(1), this Court finds this motion suitable for decision without oral argument.

Committee of the State of New York. The Committee revoked Dr. Goomar's license to practice medicine, effective June 1987. Plaintiff has not practiced medicine since that time.

Plaintiff was covered under the Sentry Policy from September 1, 1974 to September 1, 1988. He was covered under the Centennial Policy from October 1, 1982 to on or about June 7, 1987. In March 1992, plaintiff submitted a claim to both Centennial Life and Sentry Life at the urging of his treating psychiatrist, Dr. David Garmon. Plaintiff alleges that his disability led to the conduct that caused the loss of his medical license.

Both Centennial Life and Sentry Life, acting independently, investigated plaintiff's claims and denied those claims on the ground that plaintiff had failed to satisfy policy requirements for payment of disability benefits. Specifically, defendants found no evidence showing that plaintiff was totally disabled from performing the material duties of his occupation during the time period that either policy was in force. Additionally, both policies require that the insured be under the care of a physician during the period of total disability. Defendants assert that plaintiff sought no medical attention for the problems he now contends disable him until September 1989—after both policies had terminated.

Defendants Centennial Life and Sentry Life seek summary judgment in their favor on all issues raised by plaintiff in this lawsuit and request that the entire Complaint be dismissed with prejudice. Alternatively, defendants request that plaintiff's third claim for breach of the implied covenant of good faith and fair dealing and fourth claim for breach of fiduciary duties be dismissed on the ground that defendants' denials of plaintiff's claims were reasonable and these claims must therefore fail as a matter of law. Plaintiff, on the other hand, contends that he is entitled to summary judgment that there is coverage under both disability insurance policies based on the language of the policies.

## DISCUSSION

### A. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the Court must examine all the evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material facts exists. Fed.R.Civ.P. 56(c); *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54. If the moving party does not bear the burden of proof at trial, he may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. The moving party is not required to produce evidence showing the absence of genuine issue of material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). Instead, "the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." *Lujan*, 497 U.S. at 885, 110 S.Ct. at 3187 (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553).

Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support

the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

To make such a showing, the non-moving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. Such evidence need not be in a form admissible at trial to avoid summary judgment. *Id.* The moving party is entitled to judgment as a matter of law if the non-movant fails to make a sufficient showing of an element of its case with respect to which it has the burden of proof. *Id.*

## B. *THE CENTENNIAL POLICY*

The Centennial Life Policy provides coverage to "Eligible Persons." An "Eligible Person" is defined in relevant part as:

An active Member of the Holder who is: ... Under age 60 and actively performing the full-time duties of his profession or occupation.

(McClelland Declaration, Exhibit A at p. 6.) Following the cessation of his medical practice in June 1987, plaintiff was no longer an "Eligible Person" under the Centennial Policy because he was no longer actively performing the full-time duties of his occupation. The issue is then whether plaintiff met the Policy's requirements for disability benefits prior to June 1987.

The Centennial Policy defines "Total Disability" in relevant part as:

Total Disability for Present Occupation shown in the Schedule of Benefits shall mean Sickness or Injury which totally and continuously prevents an Insured who is: ... A medical, dental or osteopathic practitioner, at least 75% of whose practice has

been limited to one recognized specialty area of medicine, dentistry or osteopathy for at least 2 years prior to such disability, from performing the material and substantial duties of that specialized area of practice. ...

(McClelland Declaration, Exhibit A at p. 8.) The term "Sickness" is defined in pertinent part as:

Sickness or disease which causes the Insured to be totally disabled for a period of time. The Sickness must begin while the Insured's coverage is in force.

(McClelland Declaration, Exhibit A at p. 7.) With respect to the criteria for the payment of disability benefits, the Policy provides:

We will pay the Monthly Disability Benefit shown in the Schedule of Benefits for Present Occupation or Any Occupation under these conditions:

(1) Total Disability exists as defined above; and

(2) The Insured receives the Regular Care and Attendance of a Physician.

(McClelland Declaration, Exhibit A at p. 8.) The Policy defines "Regular Care and Attendance of a Physician" as follows:

A planned program of observation and treatment which is:

(1) Carried out by a Physician; and

(2) In accordance with current standards and customs of medical practice; and

(3) Necessary for the Sickness or Injury causing the disability.

(McClelland Declaration, Exhibit A at p. 7.) With respect to termination of insurance, the Policy provides in relevant part:

Insurance will end on the earliest of the following:

(1) The date the Holder ends the Policy;

(2) The date the Insured retires or ceases to be actively at work, unless he ceases such active work as a result of Total Disability;

(3) The date the Insured ceases to be a Member of the Holder; ...

(6) The last day of the Grace Period if the premium due remains unpaid...:.

We will refund any Premium which is unearned because coverage ended. The Premium refund will be prorated. Termination of the Insurance will not affect any claim the Insured may have which began before coverage ended.

(McClelland Declaration, Exhibit A at p. 11.) Finally, the Centennial Policy requires that proof of loss be submitted by the claimant:

Proof of loss must be furnished to Us within 90 days after the date of loss. We will not deny or reduce a claim if it was not reasonably possible for the Insured to give Us proof within the time allowed. In any event, the Insured must give Us proof within 1 year after it is due unless he is mentally incompetent.

(McClelland Declaration, Exhibit A at p. 27.)

1. *Total Disability.*

█ The court finds that plaintiff was not totally disabled under the Centennial Life Policy. Even assuming that plaintiff was seeing astral beings prior to June 1987, that alleged problem did not prevent plaintiff from performing the substantial and material duties of his occupation. Although plaintiff argues that his "sickness" caused him to molest four female patients, which in turn caused him to lose his medical license, there is no evidence that plaintiff molested anyone after April 1984. Plaintiff's wife, Shukla Goomar, who worked as plaintiff's office manager, testified that she did not feel her husband needed psychiatric help at the time the molestations were occurring. Mrs. Goomar further confirmed that her husband continued to practice medicine until his license was revoked in early 1987. Prior to 1987, Mrs. Goomar never saw her husband do anything that was detrimental, dangerous or improper with respect to a patient. She testified in her husband's behalf at the revocation hearings and never mentioned anything to the board about the mental problems plaintiff now claims he had at that time. Mrs. Goomar also testified that she did not know whether her husband was disabled when he lost his medical license in 1987. (Supplemental Roe Declaration, Exhibit I at pp. 121–25.) Several other witnesses have also testified that plaintiff practiced competently for three more years after the incidents of molestation—May 1984 to June 1987—with no apparent disabling effects from his alleged "sickness." Thus, plaintiff fails to come within the definition of "total disability" under the Centennial Life Policy.

2. *Regular Care And Attendance Of A Physician.*

█ It is undisputed that plaintiff was not under the regular care and attendance of a physician at any time during the coverage period. Plaintiff testified that he intended to cancel his coverage with Centennial Life in 1987, and he knew he would not be covered for disability after he ceased practicing medicine full time. Having cancelled the policy, effective June 8, 1987, and having accepted a refund of premiums paid for coverage after that date, plaintiff's coverage under the Centennial Policy terminated no later than June 7, 1987. He did not receive any form of medical care or treatment until September 1989, more than two years after cancellation of his coverage. Therefore, the court finds that plaintiff also fails to satisfy this second policy requirement for disability benefits under the Centennial Life Policy.

3. *Proof Of Loss.*

█ The Centennial Policy requires that proof of loss be submitted by the claimant within one year of the loss, unless claimant is mentally incompetent. Plaintiff did not submit a claim to Centennial Life until March 1992 at the urging of his treating psychiatrist, Dr. David Garmon. Plaintiff argues that his psychosis prevented him from recognizing that a sickness was the cause of his disability. (Gottschalk Deposition, Exhibit E at pp. 29:21–31:7.) Because he could not realize that his psychosis caused him to become disabled, plaintiff argues that he cannot be expected to comply with proof of loss requirements. (Garmon Deposition, Exhibit H at pp. 28:25–29:2.)

Moreover, plaintiff asserts that when no prejudice results from the delay in filing a proof of loss, it does not defeat coverage. *Hanover Ins. Co. v. Carroll,* 241 Cal.App.2d 558, 560, 50 Cal.Rptr. 704 (1966). Plaintiff argues that his delay in tendering the proof

of loss, caused by the sickness that rendered him disabled, has resulted in no prejudice to the insurers in this case. The insurers have received and reviewed all medical records relating to plaintiff and have conducted an extensive investigation of the State of New York proceedings.

As defendants point out, however, there is no evidence that plaintiff has ever been adjudged legally incompetent by any court or that he lacked legal capacity at any time. Plaintiff's inability to practice his regular occupation was due to his license revocation, rather than sickness or injury. Plaintiff continued to practice medicine until he was forced to stop when his license was revoked by the State of New York. Plaintiff testified that he fought the license revocation and would have continued to practice if he had not lost his license. (Roe Declaration, Exhibit A at p. 11.) Accordingly, the court finds that plaintiff has failed to satisfy the proof of loss requirement.

## C. *THE SENTRY LIFE POLICY*

The analysis of plaintiff's coverage under the Sentry Policy is similar to that described above, but the policy language is slightly different. The Sentry Policy provides for the payment of monthly disability benefits under the following conditions:

> If total disability of the Insured commences while the policy is in force as to the Insured, and continues throughout the Elimination Period as stated in the Schedule, the Company will pay the amount of the Monthly Indemnity stated in the Schedule applicable to the Insured for each month (or one-thirtieth of such Monthly Indemnity for each day) throughout which such total disability continues beyond such Elimination Period. . . .

(Klemp Declaration, Exhibit A at p. 14.) The term "Total Disability" is defined in the Sentry Policy as follows:

> "Total Disability", as used herein, means disability caused by injury or sickness commencing while the policy is in force as to the Insured, which prevents the Insured from performing the duties of his then current occupation, beyond the end of the elimination period and which requires the

regular care and attendance of a currently licensed physician or surgeon other than the Insured subject to Paragraph (C) of the section entitled "Monthly Indemnity, Part I".

(Klemp Declaration, Exhibit A at p. 8.) The Sentry Policy defines the term "Sickness" as:

> Sickness or disease which causes a period of total disability commencing while the policy is in force as to the Insured.

(Alvord Declaration, Exhibit A at p. 2.) The Policy defines "Regular care and attendance" as:

> Observation and treatment to the extent necessary under existing standards of medical practice for the condition causing total disability.

(Alvord Declaration, Exhibit A at p. 2.) "Current Occupation" is defined in an amendatory rider to mean:

> The material duties of the medical specialty then being practiced or of the occupation being performed immediately prior to total disability.

(Alvord Declaration, Exhibit A.) Finally, the "Proof of Loss" provision of the Sentry Policy provides:

> Written proof of loss must be furnished to the Company, in the case of claim for loss for which the policy provides any periodic payment contingent upon continuing loss, within 90 days after the termination of the period for which the Company is liable. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

(Klemp Declaration, Exhibit A at p. 21.)

The analysis of plaintiff's coverage under the Sentry Policy with respect to total disability, regular care and attendance of a physician, and proof of loss is similar to the analysis described above under the Centennial Policy. Therefore, for the reasons previously stated, the court finds that plaintiff

fails to satisfy the policy requirements for payment of disability benefits under the Sentry Policy.

### D. *FACTUAL DISABILITY v. LEGAL DISABILITY*

■ It is a general rule that disability insurance policies, such as those at issue in the instant case, provide coverage for *factual disabilities* (i.e., disabilities due to a sickness or injury) and not for legal disabilities. *See* 15 G. COUGH, CYCLOPEDIA OF INSURANCE LAW § 53.41 (2d ed. 1983). Applying that general rule in federal cases involving determinations of "total disability" under the Social Security Act, courts have uniformly rejected recovery of disability benefits relating to illegal activity and consequent imprisonment resulting from acts which were allegedly caused by mental impairments. *Pierce v. Gardner,* 388 F.2d 846, 847–48 (7th Cir.1967), *cert. denied,* 393 U.S. 885, 89 S.Ct. 197, 21 L.Ed.2d 162 (1988); *Bertram v. Secretary of H.E.W.,* 385 F.Supp. 755, 757 (E.D.Wis.1974); *Waldron v. Secretary of H.E.W.,* 344 F.Supp. 1176, 1180 (D.Md.1972). In reaching these results, courts have focused on the causation portion of the definition of disability in the Social Security Act, which requires that the disabled individual be unable to "engage in any gainful activity by reason of any medically determinable physical or medical impairment." 42 U.S.C. § 423(d)(1)(A).

In *Massachusetts Mutual Life Ins. Co. v. Ouellette,* 617 A.2d 132 (Vt.1992), the Vermont Supreme Court accepted and applied the reasoning of these Social Security Act cases. Massachusetts Mutual had issued disability and life insurance policies to an optometrist, James E. Ouellette. After Ouellette was found guilty of lewd and lascivious conduct with a minor and was imprisoned, he filed claims with Massachusetts Mutual seeking disability benefits and a waiver of his obligations to pay life insurance premiums due to his alleged disabling mental illness of pedophilia. Following his conviction, Ouellette surrendered his license to practice optometry—his regular occupation for the purpose of the Massachusetts Mutual policies. It was undisputed that his mental disorder first manifested itself in the 1970's and that

he continued to practice his occupation until his arrest in 1987. Massachusetts Mutual, in response to Ouellette's claim for disability benefits and waiver of premium, sought declaratory relief that it was not required to honor those claims. The Vermont Supreme Court upheld Massachusetts Mutual's position and denied recovery to Ouellette. In its decision, the Vermont Supreme Court reasoned that Vermont public policy required rejection of Ouellette's claims:

> Imposing liability on disability insurance companies in cases like this would be contrary to public interest in discouraging coverage for an insured's own intentional criminal conduct. *See Cooperative Fire Ins. Assoc. v. Domina,* [137 Vt. 3] 399 A.2d 502 (1979) (even an innocent co-insured cannot recover a Fire Insurance policy when another co-insured intentionally destroyed their property). Although defendant now asserts that his behavior was caused by a mental illness and was nonvolitional, his conviction is inconsistent with that position. Insanity was available to defendant as a defense . . . and he failed to use it.

*Ouellette,* 617 A.2d at 135.

Moreover, the *Ouellette* Court relied on the fact that, although Ouellette's pedophilia had manifested itself in the 1970's, he continued to practice optometry for nearly 10 years. He would not have stopped practicing except for the initiation of criminal proceedings which resulted in incarceration and surrender of his license. Prior to the criminal proceedings, Ouellette felt physically and mentally able to assume the duties of his occupation and never sought medical treatment. *Id.* at 134. Accordingly, the Vermont Supreme Court held:

> There is no evidence to contradict the trial court's conclusion that it is the legal consequences of his behavior that preclude the defendant from being able to work, not his mental illness. Summary judgment was appropriate.

*Id.*

■ Analogously, in the instant case, plaintiff is seeking benefits for a legal disability, rather than a factual disability, which is not covered under either of the subject policies. Plaintiff attempts to distinguish his case from *Ouellette* by arguing that unlike

the optometrist in *Ouellette,* he: (1) was not convicted of a crime; (2) did not voluntarily surrender his license; (3) does not suffer from a sexual deviance such as pedophilia; and (4) is unaware of his condition. These distinctions, however, are irrelevant. Plaintiff's inability to practice his regular occupation is due to his license revocation rather than sickness or injury. Plaintiff continued to practice medicine until he was forced to stop when his license was revoked by the State of New York. Plaintiff testified that he fought the license revocation and would have continued to practice if he had not lost his license. (Roe Declaration, Exhibit A at p. 11.) Both Centennial Life and Sentry Life are therefore entitled to summary judgment in their favor on all issues raised in plaintiff's Complaint.

### E. *THE SPECULATIVE TESTIMONY OF DR. GARMON AND DR. GOTTSCHALK*

 Both Dr. Garmon and Dr. Gottschalk testified that in their opinions plaintiff suffered from a psychotic condition during the time period from 1980 to 1984 and that this condition caused him to molest four female patients. It is undisputed that plaintiff did not seek medical care until September 1989; no medical records exist which show the existence of a psychotic condition prior to that date. Yet, Dr. Garmon, who first saw plaintiff in 1992, and Dr. Gottschalk, who first saw plaintiff in 1993, claim that they can opine as to plaintiff's condition fourteen years ago based upon his self-report to them. The court rejects this testimony as unsupported speculation.

In *Daubert v. Merrell Dow Pharmaceutical,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993), the Supreme Court held that expert testimony is admissible "if *scientific,* technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue." (emphasis in original) The Court indicated that " . . . 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* If proffered expert testimony is no more than unsupported speculation, the trial judge should exclude it. *Id.* at ——, 113 S.Ct. at 2796. Retrospective expert testimony regarding the existence or onset of a mental illness is inadmissible speculation. *Benchmaster, Inc. v. Kawaelde,* 107 F.R.D. 752 (E.D.Mich.1985). *Accord Coca-Cola Bottling Co. v. Torres,* 255 F.2d 149 (1st Cir.1958); *Bruce v. Estelle,* 536 F.2d 1051, 1057 (5th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1976); *Conner v. Wingo,* 429 F.2d 630, 637 (6th Cir.1970), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 121 (1972).

In *Benchmaster,* the plaintiff alleged that defendants had extorted money from him between 1972 and 1982 by overcoming his will. The defendants filed a motion to compel the plaintiff to submit to a mental examination to determine whether in fact the plaintiff's will was overcome during the ten-year period. The magistrate denied the motion, finding that the results of such an examination would probably be inadmissible at trial. *Benchmaster,* 107 F.R.D. at 753.

On appeal the district court affirmed the magistrate's decision, finding that a psychiatrist's opinion regarding the plaintiff's mental state ten years earlier would be inadmissible speculation. The court stated: "[A] psychiatrist would not be able to assist the fact finder in determining whether a person suffered, rather than suffers from, an emotional distress or disturbance and, if so, the cause of that emotional suffering." *Id.* at 754. The *Benchmaster* Court therefore concluded that psychiatric testimony concerning the plaintiff's emotional state during the years 1972 through 1982 would be speculative.

In the instant case, the court finds that the testimony of Dr. Garmon and Dr. Gottschalk is similarly speculative and therefore inadmissible. They admit that they cannot accept plaintiff's statements at face value because the very nature of plaintiff's present psychotic condition renders his statements about his past life unreliable and self-serving. Thus, their opinions lack foundation.

Accordingly, there is no competent medical evidence that plaintiff suffered from a sickness that caused him to be totally disabled within the period of coverage of either the Centennial Life Policy or the Sentry Life Policy. In insurance disputes the burden is on the insured to prove all facts necessary to show that his claim falls within the terms and conditions of coverage. *Borg-Warner Corp.*

*v. Insurance Co. of North America,* 174 A.D.2d 24, 31, 577 N.Y.S.2d 953, 957 (N.Y.App.Div.1992); *Royal Globe Ins. Co. v. Whitaker,* 181 Cal.App.3d 532, 226 Cal.Rptr. 435 (1986); *Grossman Iron & Steel Co. v. Bituminous Cas. Corp.,* 558 S.W.2d 255, 259 (Mo.App.1977). The court finds that plaintiff has failed to meet that evidentiary burden in this case.

### F. SUPPLEMENTAL MOTIONS AND OBJECTIONS

The following supplemental motions and objections were filed in this matter: (1) plaintiff's responses and objections to defendants' statement of uncontroverted facts; (2) plaintiff's objections and motion to strike portions of defendants' evidence; (3) plaintiff's objections and motion to strike defendants' untimely reply; and (4) defendants' evidentiary objections to evidence offered by plaintiff in support of his motion for summary judgment. In light of the court's decision to grant defendants' motion for summary judgment and to deny plaintiff's motion for summary judgment, the court finds that these motions are moot and need not be decided.

IT IS SO ORDERED.