**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Plaintiff,**

v.

**Wayne N. FLEISCHER, Defendant.**

**No. CV 96–0791 ABC (SHX).**

United States District Court, C.D. California.

Aug. 24, 1998.

Stephen H. Galton, David J. Weinman, Galton & Helm, Los Angeles, CA, for Plaintiff.

Joseph M. Lovretovich, Woodland Hills, CA, for Defendant.

**ORDER RE: PROVIDENT LIFE'S MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY SUMMARY ADJUDICATION**

COLLINS, District Judge.

The Motion for Summary Judgment or Alternatively Summary Adjudication of PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY ("Provident") came on regularly for hearing before this Court on August 24, 1998. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Provident's Motion is GRANTED.

### I. Factual Background

The undisputed facts relevant to Provident's motions are as follows:

On October 15, 1982, Provident issued a disability insurance policy to Wayne N. Fleischer (the "Policy"). The Policy provides benefits for "Total Disability" when the insured "due to Injuries or Sickness [is] unable to perform the duties of your occupation." Declaration of David J. Weinman, Exh. 1, at 4. The Policy defines the insured's occupation

as "the occupation ... in which you are regularly engaged at the time you become disabled." Weinman Decl., Exh. 1, at 4. In his application for the Policy, Fleischer lists his occupation as "insurance agent."[1]

Before 1993, Fleischer was in business for at least fifteen years in Ventura County as an insurance agent and financial planner. According to Fleischer, he was a very successful businessman. The income figures he supplied on the application to The Paul Revere Life Insurance Company ("Paul Revere") show six-figure incomes per year from 1986–88.

In 1992, a search warrant was issued for Fleischer's business records. Fleischer continued to work during this period. On June 7, 1993, Fleischer was indicted by a grand jury of criminal fraud involving over $1,000,-000 over several years. That same day, Fleischer was arrested.

On April 2, 1994, Dr. Nasse prepared a report stating that Fleischer was totally disabled by major depression. Dr. Nasse testified that Fleischer's depression resulted from the stress of the criminal indictment. Dr. Nasse testified that if Fleischer did not have the stress of the criminal indictment, he may have been fine. Dr. Nasse's report indicates that Fleischer first consulted Dr. Nasse on June 2, 1993 and that he expected Fleischer to resume part-time work on June 30, 1994.

On April 29, 1994, Fleischer submitted a statement of claim to Provident claiming that he was totally disabled due to "major depression." Fleischer's Notice of Claim indicates that he first obtained medical treatment for his alleged disability from Dr. John Nasse on January 10, 1994. Fleischer's Notice of Claim also indicates that his disability commenced on January 15, 1994.

About the time of his claim, Fleischer described his occupation as "financial planning and consulting." Fleischer told Provident he received $6,000 a month in disability coverage under a Paul Revere policy and $4,000 per month under a CIGNA policy. Provident promptly processed Fleischer's claim and began to pay monthly benefits of $2,950.

On September 16, 1994, Provident's investigator Donald Pooler met with Fleischer at his residence and learned that Fleischer was incarcerated on June 7, 1993 resulting from his indictment for fraud, grand theft, and other crimes. Pooler also learned that Fleischer was jailed for one month and was presently out on bail.

On December 29, 1994, Provident wrote to Fleischer informing him it had determined "that your inability to perform the duties of your occupation is the result of legal actions taken against you and not the result of disability [caused] by Injury or Sickness; therefore, no further benefits are payable." Weinman Decl., Exh. 32. Provident indicated that it closed Fleischer's claim and that it decided not to pursue the erroneous overpayment of disability benefits in the amount of $31,900.

On February 1, 1995, Provident agreed, at Fleischer's request, to reconsider its position and to keep paying benefits to Fleischer while it continued its investigation. On March 15, 1995, Provident again wrote to Fleischer's counsel and indicated that it would continue to pay benefits to Fleischer under a reservation of rights until it completed its claim investigation.

In September 1995, Fleischer pled guilty to four felonies.[2] This matter received major publicity throughout Ventura County and in Fleischer's business community. On December 11, 1995, Fleischer was indicted a second time for 22 felony charges of false statements in the sale of securities, money laundering, and grand theft.

On January 30, 1996, Provident discontinued payment of benefits to Fleischer. The letter indicated that Provident's investigation revealed: (1) a criminal indictment was filed against Fleischer on June 7, 1993; (2) Fleischer pled guilty to several felonies; (3) Fleischer was sentenced to seven years in state prison and ordered to pay restitution in the amount of approximately $1.8 million; (4) Fleischer's insurance license expired and Fleischer will not be able to renew it due to his conviction; and (5) Fleischer's NASD

---

1. Fleischer reported income of about $48,000 in 1981 and $68,000 for 1982.

2. Fleischer is presently appealing this conviction based on Fleischer's alleged incompetency to enter his guilty plea.

registration expired and it is unlikely that he can be reinstated due to his criminal conviction. Based on these facts, Provident concluded that Fleischer was not entitled to total disability benefits under the Policy for four reasons:

(1) Fleischer is not totally disabled from his former occupation as a financial consultant;

(2) Fleischer's present inability to work is due to the loss of his insurance license, his NASD registration, and his incarceration and not from a disability resulting from injury or sickness;

(3) Fleischer's conduct that resulted in the loss of his professional license, registration, and his incarceration was willful and his alleged disability was uninsurable under California Insurance Code § 533; and

(4) Fleischer suffers from a legal disability, rather than a factual disability.

Weinman Decl., Exh. 37.

In June 1996, Fleischer was found incompetent to stand trial for the crimes alleged in the second indictment and was committed to a hospital.

Dr. Malcolm Normington, a treating psychiatrist for inmates, including Fleischer, testified that, in his opinion, Fleischer was faking a case of bipolar disorder. Fleischer told Lori Perlman, a state-certified psychiatric technician who worked with Dr. Nasse when he treated Fleischer, "They can't put me in jail if I'm in the hospital." Weinman Decl., Exh. 41, at 42. Fleischer also asked Perlman to add more "colorful adjectives" to the disability claim form prepared by Dr. Nasse to make his disability claim look better.

On September 5, 1995, Fleischer wrote a letter to his second treating psychiatrist, Dr. Stephen Matlin stating, "I may claim I was a drug user, and by doing this, a six-year sentence could be reduced to ten months." Weinman Decl., Exh. 38. Dr. Matlin testified that he would have diagnosed Fleischer with major depression when he first came to him. Dr. Matlin testified that Fleischer's depression resulted from Fleischer's legal problems. Dr. Matlin testified that he believed Fleischer's depression would end when his legal difficulties stopped and when he was released from prison.

Dr. Matlin later changed his diagnosis from major depression to bipolar disorder. Nevertheless, Dr. Matlin testified that when Fleischer's depression ended, he would be able to resume the substantial material duties of a businessman's job notwithstanding his bipolar disorder. Dr. Matlin testified that regardless of whether Fleischer's mental condition was characterized as bipolar or depression, it was caused by the indictment and incarceration.

On May 14, 1998, Dr. James T. Long conducted a three-hour face-to-face interview with Fleischer. Dr. Long also conducted other interviews and reviewed Fleischer's medical records and other information. Based on his review, Dr. Long concluded, among other things, that Fleischer was diagnosed with bipolar disorder in 1978. Dr. Long's report states:

> Since early 1994 to the present Wayne Fleischer has been totally, temporarily disabled. His disability would exist even had the indictment not occurred as his ability to judge business plans and the people with whom he worked was becoming untenable. His internal fragility for the past 4 plus years has been such that he could not realistically function in the work arena. His internal world caved in and consequently his external world has as well. His current plight is the direct product of his long standing Bipolar Disorder.

Declaration of James T. Long, M.D., Exh. B at 47.

On June 10, 1998, the hospital issued a Certification of Mental Competency for Fleischer.

## II. Procedural Background

Provident filed a complaint in this Court on February 5, 1996. Provident's complaint alleges causes of action for: (1) declaratory judgment; and (2) restitution of benefits paid.

On June 27, 1996, ROSEMARIE FLEISCHER, as conservator for Wayne Fleischer filed an Answer and Counterclaim for: (1) breach of contract; and (2) breach of the implied covenant of good faith and fair dealing.

Provident filed the instant motion for summary judgment or alternatively for summary adjudication on July 6, 1998. Provident's motion seeks entry of judgment on Fleischer's counterclaims for breach of contract and bad faith. Fleischer filed his Opposition on July 13, 1998. Provident filed his Reply on July 20, 1998.

## III. Discussion

### A. Summary Judgment Standard

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings . . . [T]he adverse party's response . . . *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. 2505; *Griffeth v. Utah Power & Light Co.,* 226 F.2d 661, 669 (9th Cir.1955).

### B. Analysis

Fleischer's counterclaim for breach of contract alleges that Provident has failed to pay disability benefits due under the Policy. Answer & Counterclaim, ¶ 6. Fleischer alleges that he became totally disabled from performing the material duties of his regular occupation, commencing in January 1994, as a result of his bi-polar depression. *Id.*

Provident seeks entry of judgment on Fleischer's breach of contract counterclaim because Fleischer cannot demonstrate, as required under the Policy, that an illness or injury resulted in his inability to perform his occupational duties.

The Court finds that Provident is entitled to summary judgment on Fleischer's breach of contract counterclaim because Fleischer's total disability resulted from a legal consequence—his incarceration resulting from his criminal activity—rather than from a factual disability.

█ "It is a general rule that disability insurance policies . . . provide coverage for factual disabilities (i.e., disabilities due to a sickness or injury) and not for legal disabilities." *Goomar v. Centennial Life Ins. Co.,* 855 F.Supp. 319, 325 (S.D.Cal.1994) (citation

omitted), *aff'd*, 76 F.3d 1059 (9th Cir.1996). In cases involving determinations of total disability under the Social Security Act, "courts have uniformly rejected recovery of disability benefits relating to illegal activity and consequent imprisonment resulting from acts which were allegedly caused by mental impairments." *Id.* (citing *Pierce v. Gardner*, 388 F.2d 846 (7th Cir.1967)); *Bertram v. Secretary of H.E.W.*, 385 F.Supp. 755, 757 (E.D.Wis.1974); *Waldron v. Secretary of H.E.W.*, 344 F.Supp. 1176, 1180 (D.Md.1972).

Two California district courts have addressed the issue presented by this case. In those cases, the courts held that a mentally ill insured is not entitled to disability benefits if the insured ceases working based on a legal disability—the revocation of a license to practice—rather than a factual disability—a sickness or injury.

In *Goomar*, the State of New York revoked the insured physician's license to practice medicine because he had molested several patients. Goomar submitted a disability claim to his insurer claiming that a psychological disability led to the conduct—the molestation—which resulted in the loss of his license and his corresponding inability to work. The insurer rejected Goomar's claim.

The district court, in granting summary judgment in the insurer's favor, noted that the insured continued to practice medicine *after* the molestations occurred and until the state revoked his license. *Goomar*, 855 F.Supp. at 326. Accordingly, the court found that the insured's inability to practice medicine arose from a *legal* disability—the revocation of his license—rather than a *factual* disability—a disability due to sickness or injury.[3]

A district court in the Northern District of California reached a similar result in *Damascus v. Provident Life and Accident Ins. Co.*, 933 F.Supp. 885 (N.D.Cal.1996). In that case, the California Board of Dental Examiners found Damascus mentally disabled in 1991. Nevertheless, the Board allowed him to continue to practice under supervision. In

1995, however, the Board revoked the insured dentist's license based on repeated acts of negligence and unprofessional conduct.[4] Damascus sought disability benefits from his insurer based on "a mental disability that prevents me from practicing dentistry." *Id.* at 888. The insurer rejected the claim.

The district court granted summary judgment in favor of the insurer. The court noted that Damascus continued to practice dentistry *after* the Board found him mentally ill in 1991. The Court also rejected Damascus' claim that he had recently been unemployed because he provided no evidence that the unemployment was caused by his mental illness. Accordingly, the Court concluded that Damascus' inability to practice dentistry arose from the revocation of his license rather than any mental illness. *Id.* at 891.

Other Courts have reached similar results. In *Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688 (2d Cir.1997), the Second Circuit, relying in part on *Goomar*, affirmed the district court's grant of summary judgment in the insurer's favor. In that case, Connecticut's Statewide Grievance Committee suspended Millstein's license to practice law based on his misuse of client funds and fraudulent activities. Millstein was subsequently convicted and imprisoned for the misuse of client funds. *Id.* at 690. Millstein sought disability benefits from his insurer based on the attention deficit disorder and chemical dependency he had since childhood. Millstein claimed that these disabilities impaired his judgment and caused him to commit his crimes. The insurer rejected the claim.

The district court granted summary judgment in favor of the insurer based on the general rule that an insurer is not liable for a loss of earned income resulting from a license suspension or other legal consequences of an insured's unlawful behavior. *Id.* The court noted that Millstein did not seek treatment for these long-term illnesses until his license to practice law was in jeopardy. The court also noted that Millstein admitted that

---

**3.** The Ninth Circuit affirmed the district court's grant of summary judgment in favor of the insurer, holding that the physician had failed to present a genuine issue as to whether his alleged sickness caused the loss of his license. *Goomar*, 76 F.3d at 1063.

**4.** The Board's 1995 ruling expressly disavowed any reliance on the prior finding of Damascus' mental disability.

he could still practice law today if he were not suspended. The Second Circuit stated: "We find that a rule which would allow a lawyer to steal from his clients, even when such theft occurs in the throes of a drug addiction, and then recover disability benefits for income lost due to the suspension resulting from such theft, would be against public policy." *Id.* at 691. Accordingly, the court affirmed the district court's conclusion that Millstein's loss of earned income was caused by a legal disability—his suspension—rather than a factual disability—illness resulting from his chemical dependency. *Id.*

The Vermont Supreme Court reached a similar result in *Massachusetts Mut. Life Ins. Co. v. Ouellette*, 159 Vt. 187, 617 A.2d 132 (1992). In that case, an insured optometrist pled guilty to and was imprisoned for lewd and lascivious conduct with a minor. Ouellette, after surrendering his license to practice, filed a claim for disability benefits with his insurer. Ouellette offered undisputed evidence that a mental disorder manifested itself many years before his conviction. Ouellette claimed that his mental illness prevented him from performing the duties of his occupation. The insurer rejected the claim. *Id.* at 188, 617 A.2d at 133.

The trial court concluded that because Ouellette could have continued to practice optometry had he not surrendered his license and been incarcerated, his inability to work resulted from the legal consequences of his behavior rather than a factual disability. The Supreme Court of Vermont affirmed the trial court's grant of summary judgment in the insurer's favor, stating: "After defendant's disorder manifested itself, he remained able to practice optometry for nearly ten years. He would not have stopped practicing except for the initiation of criminal proceedings, which resulted in incarceration and the surrender of his license." *Id.* at 191, 617 A.2d at 134.

Notwithstanding these authorities, Fleischer appears to argue that he is entitled to disability benefits under the Policy because his factual disability (bipolar disorder or depression) arose before any legal disability. At least two cases support the general proposition that an insured is entitled to disability benefits if the factual disability arises *before* a legal disability. *See Paul Revere Life Ins. Co. v. Bavaro*, 957 F.Supp. 444, 449 (S.D.N.Y. 1997) ("If defendant demonstrates to the trier of fact that he is unable to work because of his mental and emotional problems then he is entitled to disability payments, despite the existence of his subsequent legal disability. If, however, the trier of fact believes that but for his legal disability he would be able to perform his occupation, then he is not entitled to disability payments."); *Ohio Nat'l Life Assurance Corp. v. Crampton*, 822 F.Supp. 1230, 1233 (E.D.Va.1993) ("If the [factual] disability is medically bona fide and genuinely arose prior to [the insured's] incarceration, the fact that [the insured] was eventually imprisoned does not cut off his benefits.").

The relevant evidence demonstrates that Fleischer first suffered his factual disability in January 1994.[5] The undisput-

5. *Fleischer places great reliance on the proffered expert testimony of Dr. Long. Dr. Long, who met with Fleischer for only three hours, prepared his report over four years after Fleischer submitted his claim for disability. Nevertheless, Dr. Long concluded that Fleischer had bipolar disorder since as early as 1978. Dr. Long also concluded that Fleischer has been totally disabled since early 1994 and that his disability would exist even without the indictment.*

The Court excludes Dr. Long's testimony as speculative. Rule 702 of the Federal Rules of Evidence states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto." The Supreme Court has stated that " 'knowledge' connotes more than

subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, the court should exclude proffered expert testimony that is no more than unsupported speculation. *Id.* at 592–93, 113 S.Ct. 2786.

In this case, Dr. Long's report is of no value in assisting the court to determine the cause or onset of Fleischer's mental disability that occurred four years earlier. First, Fleischer's two treating physicians diagnosed him with depression during the relevant time period. Second, as the *Goomar* court unequivocally stated, "[r]etrospective expert testimony regarding the existence or onset of a mental illness is inadmissible speculation." *Goomar*, 855 F.Supp. at 326. Thus, the Court declines to consider Dr. Long's report.

Even if, however, the Court were to consider Dr. Long's report, it is immaterial. Accepting

ed evidence also reflects that Fleischer was indicted, arrested, and jailed in June 1993, although he was released on bail one month later. Fleischer did not actually plead guilty to the charges in the indictment until September 1995—approximately 18 months *after* Fleischer submitted his disability claim. Thus, at first blush, it appears that Fleischer's factual disability arose 18 months before his legal disability—the incarceration.

Although Fleischer's argument appears to have some surface appeal, it crumbles on closer examination. The critical comparison in this case is not between the claimed factual disability in January 1994 and Fleischer's guilty plea and incarceration in September 1995. Rather, the Court must examine the legal consequence of the initiation of the criminal proceedings against Fleischer in June, 1993.

In this case, the undisputed evidence reveals that Fleischer's illegal activity resulted in his indictment, arrest, and month-long imprisonment in June 1993. Fleischer's illegal conduct and the subsequent criminal proceedings arising directly from that conduct occurred *before* Fleischer's claimed factual disability in January 1994.

Moreover, the undisputed evidence reflects that both of Fleischer's treating physicians, Dr. Nasse and Dr. Matlin, stated that Fleischer's factual disability (depression) resulted from the stress of the criminal proceedings against him. Both physicians stated that Fleischer's depression would end when his legal difficulties ended and when he was released from prison. Dr. Matlin specifically testified that when Fleischer's depression ended, he would be able to resume his occupational duties.[6] Thus, Fleischer's factual disability arose from his own illegal activities.[7]

For all these reasons, the Court concludes that Fleischer's factual disability arose *after*, and as a result of, Fleischer's illegal activity. No coverage exists under the Policy for Fleischer's legal disability which arose before his factual disability. Thus, the Court GRANTS summary judgment in Provident's favor on Fleischer's counterclaim for breach of contract.[8]

## IV. Conclusion

For all these reasons, the Court GRANTS Provident's motion for summary judgment.

**SO ORDERED.**

---

Dr. Long's conclusion that Fleischer had bipolar disorder since 1978, it is undisputed that Fleischer performed his occupational duties from that time until January 1994, when Fleischer first filed his claim for total disability based on his inability to work. *See* Weinman Decl., Exh. 1, at 4 (indicating that the Policy provides benefits for "Total Disability" when the insured "due to Injuries or Sickness [is] unable to perform the duties of your occupation."); *see also Ouellette*, 159 Vt. at 191, 617 A.2d at 134 (noting that the insured was able to practice optometry for ten years after the disorder manifested itself). Thus, the Court find that Fleischer's factual disability arose in January 1994.

6. In fact, Dr. Matlin concluded that Fleischer would be able to return to his occupational duties when his incarceration ended, notwithstanding his bipolar condition.

7. The Court also notes that Fleischer did not seek medical treatment for his depression until just days before he was indicted and arrested on June 7, 1993. *See Millstein*, 129 F.3d at 690 (noting that the insured did not seek treatment for his long-term illnesses until his license to practice law was in jeopardy). This lends further support to the claim that the criminal proceedings arising from Fleischer's illegal activity resulted in his factual disability.

8. Because the Court GRANTS Provident's summary judgment on Fleischer's counterclaim for breach of contract, the Court also GRANTS Provident's motion with respect to Provident's bad faith claim and claim for punitive damages. *See Waller v. Truck Ins. Exch.*, 11 Cal.4th 1, 44 Cal. Rptr.2d 370, 390, 900 P.2d 619 (Cal.1995) ("It is clear that if there is no *potential* for coverage . . . under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."); *see also Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 271 Cal. Rptr. 246 ("[A] bad faith claim cannot be maintained unless policy benefits are due. . . .").