MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Plaintiff,

v.

John T. WOODALL, Defendant.

No. 402 CV 120.

United States District Court, S.D. Georgia, Savannah Division.

Aug. 21, 2003.

Arnold C. Young, Hunter, Maclean, Exley & Dunn, PC, Savannah, GA, William A. Clineburg, Jr., Matthew A. Boyd, King & Spalding, Atlanta, GA, for plaintiff.

Samuel Powel Inglesby, Jr., Inglesby, Falligant, Horne, Courington & Chisholm, PC, Savannah, GA, for defendant.

### ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

Plaintiff Massachusetts Mutual Life Insurance Company (MMLIC) brings this diversity-based, 28 U.S.C. § 2201 action to obtain a judgment declaring that its insured, defendant John Woodall, cannot recover on the disability insurance that MMLIC sold him.[1] Doc. # 1. In denying Woodall's earlier, F.R.Civ.P. 12(f) motion to strike as immaterial (etc.) references to

---

1. Actually, a predecessor company sold Woodall that and several other policies, doc. # 1

prior litigation, the Court noted that neither party had litigated Woodall's personal jurisdiction and improper venue defenses. Doc. # 23 at 4.

Woodall now moves the Court under F.R.Civ.P. 56 (styled as a "Request for Ruling") to dismiss this case for lack of venue and personal jurisdiction. Doc. # 24 ("Request"); # 25 at 10–11 (brief citing to matters outside of the pleadings). He also moves for summary judgment on the merits. Doc. # 27 (motion); # 28 (brief); # 38 (reply). MMLIC cross-moves for partial summary judgment, doc. # 33; # 39 (reply); # 42 (reply), and opposes Woodall's venue/jurisdiction motion. Doc. # 37. The parties agree that the material facts are undisputed, doc. # 22 ¶ 8; # 35 at 1, 6; # 36 at 1–10, and that this is a first-impression case. Doc. # 35 at 2.

## II. BACKGROUND

MMLIC sold (mostly in the 1980s) Woodall disability, life and business insurance policies. Doc. # 1 ¶¶ 7–9. The disability policy wording in question states that MMLIC would consider Woodall disabled "if because of sickness or injury you can't do the main duties of your occupation. You must be under a doctor's care." Doc. # 26 ¶ 9; # 36 ¶ 9. The policy expressly excludes coverage "caused or contributed to by: ● war (declared or not) ● normal pregnancy ● or normal childbirth." Id.

Starting in 1995, Woodall became embroiled in, and ultimately became depressed over, what would become known as the "Shiggs" controversy:

> Ms. Julia Mae Shiggs suffered brain damage and became comatose as the alleged result of medical malpractice. The [Chatham County, Georgia] probate court appointed Michael Mydell, Ms. Shiggs' common law husband, guardian of her person and property. In his representative capacity, Mydell retained the legal services of David Roberson for the purpose of filing in state court a malpractice action on behalf of his ward. Roberson, in turn, associated another attorney, John Woodall, to assist him in the case. During the course of trial, an oral settlement agreement was reached, and the defendants thereafter delivered significant sums to Roberson. Roberson deposited the money into his trust account. Prior to the approval of any written settlement agreement by the probate court, Roberson calculated attorney's fees as $2,400,000, and issued checks drawn on his trust account to himself and Woodall. Only then did Roberson and Woodall file petitions with the state court and probate court, seeking approval of the settlement.

*Gnann v. Woodall*, 270 Ga. 516, 516, 511 S.E.2d 188 (1999) (*Woodall I*); *see also In re Woodall*, 241 Ga.App. 196, 197–98, 526 S.E.2d 69 (1999) (*Woodall II*) (expanded factual recitation). The attorneys' failure to seek prior probate court approval of an obscene fee,[2] leaving Shiggs to die coma-

---

¶¶ 7–10 (life insurance, business overhead expense coverage), but for convenience the Court will simply refer to MMLIC. Also, several policies are in play here, *see* doc. # 26 ¶ 1; # 36 ¶ 1, but, also for convenience, the Court generally will reference them in the singular form throughout this Order.

2. *See* doc. # 1 exh. H (State Bar Special Master's Report) at 44 ("Roberson and Woodall each wanted to earn a $1,000,000 fee.

They could only achieve that personal financial goal by [inflating the *Shiggs* case settlement value to] $4,000,000 or more. [But t]he settlement was worth only $3,325,000 and perhaps a few thousand more.... The [inflated] valuation served Roberson's and Woodall's personal and financial interests, while doing nothing to advance Julia Mae Shiggs' interests"); *see also* doc. # 1 ¶ 13; # 14 ¶ 13 (Woodall admits Roberson paid him $1.1 million from the *Shiggs* settlement).

tose and in poverty,[3] ultimately led to orders of contempt for both and, for Roberson, incarceration:

> After removing Mydell as Ms. Shiggs' guardian and replacing him with J. Hamrick Gnann, the probate court refused to approve the settlement agreement and, finding that the disbursement of the settlement proceeds was improper, ordered Roberson and Woodall to pay all monies received by them on behalf of Ms. Shiggs into the registry of the state court. Ms. Shiggs died, and Gnann was appointed administrator of her estate. When Roberson and Woodall refused to pay the funds into the registry as ordered, the probate court held them in contempt.

270 Ga. at 516, 511 S.E.2d 188; *see also Woodall II,* 241 Ga.App. at 203, 526 S.E.2d 69 ("The probate court ordered Woodall to return the monies he had received pursuant to the representation. Woodall failed to do so, and the probate court properly held him in contempt for violating its ... order"); *see also* www.savannahmorningnews.com/stories/101800/LOCrobersonout.shtml (site as of 8/19/03) (noting Roberson's incarceration under contempt and that his "cohort, attorney John T. Woodall, was also under [the probate court's] order to repay his fees, but fled to Texas where he remains out of the court's reach on a civil contempt of court"); doc. # 26 ¶ 10; # 36 ¶ 10 (Woodall moved from Georgia to Texas in 3/00); # 26, attached "Stipulation" exh. I. (5/16/01 MMLIC reservation of rights letter to Woodall acknowledging Woodall's request that MMLIC keep Woodall's Texas address secret).

Woodall's wrongdoing in the *Shiggs* case ultimately led to his (and Roberson's) disbarment. Doc. # 1 ¶ 24. *See In re Woodall,* 273 Ga. 412, 418, 541 S.E.2d 649 (2001) (Clear and convincing evidence supported finding that Woodall, who contracted to assist another attorney in a medical malpractice claim brought on behalf of comatose patient, engaged in professional misconduct, and thus disbarment was an appropriate sanction, where Woodall accepted $1,100,000 in attorney fees knowing that the settlement had not been approved by probate court; Woodall, based on his level of experience as trial attorney, should have known that there was a problem with the settlement and thus should have investigated further; he did not inquire as to when a settlement hearing would be held, and, despite knowing that the settlement process was flawed, he nevertheless ratified his co-counsel's misconduct in inflating the valuation of future medical services in the settlement to $1,425,000, despite an economist's estimate of $1,091,900 for the client's seven-year life span, which inflated settlement amount to $4,800,000 and thus "justified" $2,400,000 in attorney fees); *see also In re Roberson,* 273 Ga. 651, 655, 544 S.E.2d 715 (2001) (disbarring Roberson).

As the walls closed in on him, Woodall became depressed. The parties have stipulated

> that, beginning in [2/97], [Woodall] became and has remained as of the date this suit was filed [5/29/02], unable to perform the main duties of his occupation and continually has been under a doctor's care by reason of depression and its related effects, *which resulted principally and directly from his being subject to allegations of misconduct in the [Shiggs] case,* which he disputed, and

---

3. www.savannahnow.com/features/150years/1990faces.shtml (site as of 8/19/03); *see also* www.savannahnow.com/stories/033000/LOC

shiggs.shtml (site as of 8/19/03) ("When she died, her total assets—$250, all from welfare

his initial anticipation of a reprimand from the State Bar of Georgia.

Doc. # 21 at 1 (footnote omitted; emphasis added). Both sides further acknowledge that

> [t]he [*Shiggs*] allegations led to very negative publicity and comments concerning Mr. Woodall, a civil contempt order being directed against him, a civil lawsuit being brought against him by the estate of his former client on [5/22/97], State Bar disciplinary proceedings filed against him in [12/97], and his disbarment from the practice of law on [2/5/01].

Doc. # 21 at 1–2; *id.* at 1 n. 1 (The parties "make no stipulation one way or the other regarding [Woodall's] disability after . . . [the date on which MMLIC filed this case, 5/29/02]").

MMLIC thus initially paid Woodall disability benefits, but after he was disbarred, issued him reservation of rights letters. Doc. # 1 ¶ 26; # 14 ¶ 26 (Woodall admits receiving them but disputes their effective date and scope); # 26 ¶ 8 (he agrees that after he "was disbarred, each subsequent disability payment was accompanied by [an MMLIC] reservation of rights letter . . . .").

MMLIC brought this action on 5/29/02. Doc. # 1 at 1. It contends that "Woodall's alleged disability and disbarment is the direct and sole result of his *prior* intentional misconduct, all of which predated his claims of depression." *Id.* ¶ 30. In other words, "because his legal disability and inability to work arose from his own illegal and improper conduct, [MMLIC insists that Woodall] is not entitled to benefits under the Disability Income Policy because the provision of benefits under these

circumstances would violate public policy." *Id.* ¶ 34.

MMLIC explains that, when it first started paying Woodall under its disability policy, Woodall had not yet been disbarred, so MMLIC "made such payments without knowledge of the facts that disqualify Woodall from being eligible for benefits under the policy." Doc. # 1 ¶ 35. It therefore seeks recoupment, and makes essentially the same showing for benefits it paid under its "Business Overhead Expense Policies," *id.* ¶¶ 37–42, as well as the premium-waiver it allowed on the subject life insurance policies. *Id.* ¶¶ 43–47.

## III. ANALYSIS

### A. Personal Jurisdiction/Venue

MMLIC persuasively argues that Woodall has waived his personal jurisdiction and venue defenses by litigating non-jurisdictional matters (*e.g.*, his prior motion to strike, discovery conduct, merits-based stipulation and status report co-generation) months into this case, and only now litigating these defenses *upon the Court's prompting.* Doc. # 37 at 21–22.

Unlike subject matter jurisdiction, personal jurisdiction is a waivable defense,[4] and some courts have deemed it waived through inaction. *See Datskow v. Teledyne, Inc., Continental Prod. Div.*, 899 F.2d 1298, 1303 (2d Cir.1990) ("A delay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer"); *Schwartz v. M/V GULF SUPPLIER*, 116 F.Supp.2d 831, 835 (S.D.Tex.2000) (British company that contracted with seismic gun mechanic to outfit and rig vessel in Texas waived defense of lack of personal jurisdiction by

payments—did not even cover her burial costs").

4. So is venue. *See Tri–State Employment Services, Inc. v. Mountbatten Sur. Co., Inc.*, 295 F.3d 256, 261 (2nd Cir.2002).

waiting nine months, and after extensive pretrial activity, to file motion to dismiss, even if company had complied with procedural requirements of motion); 5A WRIGHT & MILLER: FED. PRAC. & PROC. CIV.2D § 1391 (Supp.2003) ("a party can be held to have waived a Rule 12(h)(1) defense through conduct, such as extensive participation in the litigation of the merits, even if the literal requirements of Rule 12(h)(1) have been met").

■ Nevertheless, it is not necessary to deem those defenses waived because jurisdiction and venue are proper here. Note preliminarily that in order to subject a nonresident defendant to a judgment *in personam*, the minimum-contacts standard in Georgia is satisfied if the nonresident has purposefully availed himself of the privilege of doing some act or actions, or consummating some transaction with or in the forum (Georgia). *Chung–A–On v. Drury*, 276 Ga. 558, 559, 580 S.E.2d 229 (2003); *see also Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738, 745 (11th Cir. 2002) ("In a diversity action, a federal court has personal jurisdiction over a nonresident defendant to the extent permitted by the forum state's long-arm statute").

In that respect, "[p]ersonal jurisdiction may be general, which arise[s] from the party's contacts with the forum state that are unrelated to the claim, or specific, which arise[s] from the party's contacts with the forum state that are related to the claim." *Matthews*, 291 F.3d at 747; *see also id.* at 748–50 (Florida family limited partnership and related corporations had sufficient contacts with Georgia to satisfy that state's long-arm statute, for purpose of determining federal court's personal jurisdiction in debt collection action; businesses hired accounting services in Georgia, maintained bank accounts at Georgia financial institution, executed various contracts containing Georgia choice of law clause, maintained banking records in Georgia, and used secretarial and bookkeeping services in Georgia).

■ So if a plaintiff's cause of action against a nonresident arises out of, or results from, activity or activities of a defendant within the forum, and if exercise of jurisdiction is consistent with due process notions of fair play and substantial justice, personal jurisdiction is legally supported. *Drury*, 276 Ga. 558, 559, 580 S.E.2d 229; *see generally*, Ann., *Construction and application, as to isolated acts or transactions, of state statutes or rules of court predicating in personam jurisdiction over nonresidents or foreign corporations upon the doing of an act, or upon doing or transacting business or "any" business, within the state*, 27 A.L.R.3d 397 (1969).

■ Woodall does not dispute that he lived in Savannah, Georgia for decades, including through nearly all of the *Shiggs* litigation, settlement and initial recrimination events. Doc. # 32 (attached admissions); # 36 at 10–14. He did not move to Texas until 3/00, thus claiming disabling depression only as legal walls closed in on him. *Id.* He also (from 1979 onward) purchased and paid his premiums on all insurance policies at issue while living in Georgia. *Id.*

It is similarly undisputed that, while he resided in Georgia, Woodall accepted MMLIC insurance policy benefits deriving from his representation of Shiggs, committed the acts against her that resulted in his disbarment, and participated in the disbarment and *Shiggs* proceedings that prefaced and caused his depression. Doc. # 26 at 1–4; # 37 at 2–7, exh. A ¶ 12. Nearly all of the relevant factual events (hence, Woodall's contacts with Georgia), then, unfolded and impacted both parties in Georgia, not Texas.

Woodall therefore fits within Georgia's personal jurisdiction standards. *Compare*

*Gee v. Reingold,* 259 Ga.App. 894, 896, 578 S.E.2d 575 (2003) (Nonresident attorney did not transact any business in State, and thus court did not have Georgia Long Arm Statute personal jurisdiction over attorney, in client's third-party action against attorney for breach of contract, for role in allowing default judgment to be entered against client, where the only contacts between client and attorney with respect to action in which default judgment was entered were telephone conversations and facsimile transmissions initiated by client, and bills mailed by attorney to client in State; there was no evidence that attorney and client negotiated any contracts in State, and attorney's services were performed outside State and pertained to non-State matters), *and Stuart v. Peykan, Inc.,* 261 Ga.App. 46, 48–49, 581 S.E.2d 609 (2003) (Out of state resident who was guarantor of promissory note used to purchase restaurant did not purposefully avail himself of the privilege of conducting business within state, and thus, trial court lacked personal jurisdiction, where guarantor never entered state during course of purchase negotiations, his only contact with state was by telephone, and guarantor did not receive any ownership interest, direct or indirect, in return for his guaranty).

■ It is Georgia's policy to exercise jurisdiction over nonresident defendants to the maximum extent permitted by procedural due process. *Balmer v. Elan Corp.,* 261 Ga.App. 543, 548, 583 S.E.2d 131, 134, n. 4 (2003); *Matthews,* 291 F.3d at 745. That policy undergirds the result reached here.

■ Finally, the Court is not inclined to exercise its discretion with respect to Woodall's "convenient-forum" argument, doc. # 25 at 9–12, as it is conspicuous that he does not deny the Court's previous observation (*see* doc. # 23 at 1–2) that he fled Georgia to Texas to avoid being jailed for contempt of the Georgia probate court's order that he disgorge *Shiggs* settlement proceeds (in none of his subsequent filings does Woodall dispute this). The legal and moral force of another court's contempt order militates against countenancing any "inconvenience" claim made by a party who validated the maxim that when the going gets tough the tough get going.

**B. The Merits**

**1. Substantive State Law**

■ "In diversity cases, a federal court applies the law of the forum in which it sits." *Continental Cas. Co. v. Adamo,* 326 F.3d 1181, 1182 (11th Cir.2003) (quotes and cite omitted). But where " 'there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary *Erie* guesses and to offer the state court the opportunity to interpret or change existing law.' " *Id.* (*quoting Keener v. Convergys Corp.,* 312 F.3d 1236, 1241 (11th Cir.2002)).

■ However, this Court is unable to certify the issue to the state court. Some district courts can invoke a local rule and corresponding state statute to do that, *see Catipovic v. Peoples Community Health Clinic, Inc.,* 239 F.Supp.2d 917, 922–24 (N.D.Iowa 2003); *D.A.B.E., Inc. v. Toledo–Lucas County Bd. of Health,* 2001 WL 1916731 at * 5 (N.D.Ohio 2001) (unpublished), but no such option exists here. Thus, the Court must rule on a first-impression state law issue, which is much like writing "in faint and disappearing ink." *McMahan v. Toto,* 311 F.3d, 1077, 1079 (11th Cir.2002) (quotes and cite omitted).

**2. Public Policy**

■ Georgia public policy favors freedom of contract:

It is well settled that contracts will not be avoided by the courts as against public policy, except where the case is free

from doubt and where an injury to the public interest clearly appears. In examining this case we also follow the rule that the courts must exercise extreme caution in declaring a contract void as against public policy and should do so only in cases free from doubt.

*Colonial Properties Realty Ltd. Partnership v. Lowder Const. Co., Inc,* 256 Ga. App. 106, 111, 567 S.E.2d 389 (2002).

Georgia "courts [thus] will not lightly interfere with the freedom of parties to contract. [For example, a] contracting party may waive or renounce that which the law has established in his or her favor, when it does not thereby injure others or affect the public interest." *Bradford Square Condominium Ass'n, Inc. v. Miller,* 258 Ga.App. 240, 246, 573 S.E.2d 405 (2002).

Insurance contracts, however, occupy a unique place. On the one hand:

> Insurance is a matter of contract, and parties are free to fix responsibility for various risks as long as the contract does not violate state law or public policy. By law, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application made a part of the policy." OCGA § 33–24–16. Under the statutory rules of contract construction, the contract will be construed strictly against the insurer/drafter. When an insurer agrees to provide coverage to an insured, any exclusions from that coverage must be defined clearly and distinctly.

*Rutledge v. Auto–Owners Ins. Co.,* 249 Ga. App. 361, 362, 548 S.E.2d 86 (2001) (cites omitted).

But on the other hand, insurance policies are also a matter of public concern because rulings in cases involving common policies obviously affect risk and associated insurance rates at a mass level. Hence, enabling parties, by commercial transaction (*i.e.,* the purchase of an insurance policy) to shift the cost of morally and socially injurious conduct is a phenomenon more apt to be "fine-tuned" by Georgia courts.

Via statute and case-law development, then, Georgia has fine-tuned what does and does not violate its public-policy. *Compare Colonial,* 256 Ga.App. at 112, 567 S.E.2d 389 (Waiver-of-subrogation clauses are valid and binding, and are not void as against public policy when a business relieves itself from its own negligence; however, such clauses do not relieve a party from liability for acts of gross negligence or wilful or wanton conduct) *and Fowler v. Smith,* 237 Ga.App. 841, 843 n. 2, 516 S.E.2d 845 (1999) (an insurance contract providing coverage for punitive damages does not violate public policy) *with Continental Ins. Co. v. Equity Residential Properties Trust,* 255 Ga.App. 445, 446, 565 S.E.2d 603 (2002) (it is the public policy of Georgia that insureds shall not be compelled by the terms of an insurance contract written by the insurer to give up their common law right to access to the courts to resolve disputes arising under the contract), *and Davis v. Kaiser Found. Health Plan of Georgia, Inc.,* 271 Ga. 508, 510, 521 S.E.2d 815 (1999) (State public policy will not permit insurers to require an insured to agree to a provision that permits the insurer, at the expense of the insured, to avoid the risk for which the insurer has been paid by requiring the insured to reimburse the insurer whether or not the insured was completely compensated for the covered loss).

In this case the "public-policy" issue is not only first impression but troubling to say the least. Like the defendant who kills his parents and then pleads for mercy because he's an orphan (perhaps the most

fitting example of "chutzpah"), there is something inherently disturbing about a man who commits a grievous wrong, unsurprisingly becomes "depressed" when confronted and punished over it, and then demands that his disability insurer pay him for a disabling "depression" as documented by his own psychiatrists. Doc. # 26 ¶ 7.

One would think that a disability policy would explicitly include a "chutzpah" exclusion of some sort. On the other hand, policy exclusion pages would be longer than policies themselves if courts required insurers to anticipate and expressly exclude every conceivable way that an insured can engage in wrongdoing and benefit from it. Too, insurers can reasonably argue that, since fundamental public policy concerns have long been embedded in mass-policy insurance law, they shouldn't have to "laundry-list" every conceivable wrongful act upon which a claim should be denied.

██ It has been long settled law, for example, that no one may benefit from his own wrongdoing. Indeed, even a casual perusal of the case law reflects this. Those who lead the police on a car chase and suffer injury or death, for example, may not (nor may their estate or kin) collect damages. *See City of Winder v. McDougald,* 276 Ga. 866, 867–68, 583 S.E.2d 879, 879–81 (2003).

Likewise, a man who murders his wife cannot collect on her life insurance policy. *Adamo,* 326 F.3d at 1183 (district court held that husband could not recover life insurance benefits under O.C.G.A. § 33–25–13 because he had been convicted of murdering his wife, the insured; question whether husband must be given opportunity to challenge his conviction via direct appeal or collateral attack before he is barred from recovering the benefits was certified to Georgia Supreme Court); *see also Krause v. Vance,* 207 Ga.App. 615,

622, 428 S.E.2d 595 (1993) (upholding "civil murder," or "slayer's rule" verdict that husband who murdered his wife could not recover her life insurance policy proceeds or inherit her estate); *cf. Carringer v. Rodgers,* 331 F.3d 844, 850 (11th Cir.2003) (Mother whose son was murdered by his wife had standing, as a parent, to assert a § 1983 claim for the wrongful death of her son in violation of his constitutional rights, where the spouse-murderer was precluded from recovery under state law); *Belluso v. Tant,* 258 Ga.App. 453, 455–56, 574 S.E.2d 595 (2002) (Exercise of superior court's equitable powers was warranted to allow decedent's father the right to sue decedent's husband for wrongful death following fatal automobile accident in which husband was the driver, even though the surviving spouse ordinarily has the sole right to bring a wrongful death claim; husband could not bring an action against himself, legislature expressed its intent to provide right of recovery in every case of the homicide of a child who does not leave a spouse or a child, and a contrary holding would have left decedent's father with no remedy at law and would have allowed husband to go unpenalized), rationale expressly approved in *Carringer v. Rodgers,* 276 Ga. 359, 363–64, 578 S.E.2d 841 (2003); *Stephens v. Adkins,* 214 Ga.App. 653, 654, 448 S.E.2d 734 (1994) (son convicted of voluntary manslaughter of his father could not recover as co-beneficiary under father's life insurance policy), cited in Ann., *Killing of insured by beneficiary as affecting life insurance or its proceeds,* 27 A.L.R.3d 794 § 6 (1969) ("Where the insured's death is caused by the beneficiary unintentionally or not feloniously, it has been generally held that the latter can recover the proceeds of the insurance policy").

The ban against permitting one to benefit from one's wrongdoing, of course, is nothing new and extends beyond the insur-

ance context. Hence, one who misuses her defense lawyer in a criminal case cannot later claim that her counsel was ineffective. *U.S. v. Lamplugh,* 334 F.3d 294, 300–01 (3rd Cir.2003) (defendant forfeited her right to effective assistance of counsel by presenting falsified copies of tax returns in support of her theory of defense that original returns had been properly filed).

It is in this light that MMLIC asks this Court to read a public-policy exclusion into its policy "as a matter of general insurance law and public policy." Doc. # 35 at 9; *see also id.* at 6 ("it is undisputed that the cause of Woodall's disability is his own misconduct in the *Shiggs* case"). Given Woodall's arguments against that result, the issue is best explored by re-tracing the coverage, claim pay-out, and claim-denial phases that occurred in this case:

> Phase 1 (*Pre–Shiggs events*): MMLIC issues Woodall a disability policy that, the parties agree, covers a depression-caused disability; Woodall made no claims and paid premiums from 1981 onward;
>
> Phase 2 (*Pre-disbarment*): After committing disbarable acts, Woodall became depressed *before* the Georgia Bar disbarred him, *and during that time,* MMLIC accepted the disability claim (hence, a "factual disability") by paying out under the policy;

> Phase 3 (*Post-disbarment*): After he was disbarred, Woodall became "legally disabled" from working in his occupation (*i.e.,* he could no longer work because of his disbarment, not just his depression); [5]
>
> Phase 4 (*litigation*): MMLIC seeks a judgment declaring that it can cease disability payments and recoup all prior payments and premium-waivers. Doc. # 1 at 16–17; # 35 at 23–24.

Note that, in contrast to case law showing insurers seeking to terminate benefits when a *legal* disability prevents the claimant from working in his occupation, even if the *factual* disability (his depression) may still exist, MMLIC insists that it can terminate (and recoup) *all* benefits because Woodall intentionally engaged in wrongful ("disbarable") conduct and caused his own depression (disability), and that no physical or mental disability caused him to commit his wrongdoing in the first place.

MMLIC supplies two streams of case law in its briefs. One has courts denying disability coverage claims because it violates public policy to allow a wrongdoer to contractually benefit from his wrongdoing (*e.g.,* a husband could not murder his wife, then collect on a depression–based disability policy that he purchased prior to his crime).

Another says that, even though there may exist a *factual* disability (*e.g.,* medical-

---

**5.** "When called upon to review these claims, the courts have distinguished between persons who are unable to engage in their profession and those who are not allowed to do so. This distinction is reflected in the courts' differentiation between factual disabilities and legal disabilities." *Massachusetts Mut. Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 26 (Tenn. Ct.App.2002); *see also id.* at 29–32 (Psychologist's loss of income *after* revocation of his license was due to loss of his license, not his depression, and, thus, he was not "disabled" within meaning of his disability policy; the loss of his license was a "legal disability" not

covered by the policy, and the insured failed to demonstrate that his depression had actually impaired his ability to practice psychology before the licensing board revoked his license); *see also* COUCH ON INSURANCE § 146:9 n. 56 (*"Legal Disability" Arising From Prohibition Against Performing Specific Occupation*) (2003) ("It is a general rule that disability insurance policies provide coverage for factual disabilities, *i.e.,* disabilities due to sickness or injury, and not for legal disabilities. *BLH ex rel. GEH v. Northwestern Mut. Life Ins. Co.,* 92 F.Supp.2d 910 (D.Minn.2000)").

ly-certifiable depression) preventing the policy-holder from earning income from his occupation, a superceding *legal* disability (here, Woodall's disbarment) trumps the former and thus entitles the insurer (MMLIC) to deny coverage. Doc. # 35.

But many courts, Woodall correctly points out, deny coverage only where the legal disability *precedes* the factual disability (*i.e.*, the insured is caught at some form of wrongdoing, loses his license to carry out his trade or profession, *then* gets "depressed" and claims the depression disables him). *See* doc. # 28 at 8–18.

Conversely, courts uphold coverage where factual precedes legal disability (*i.e.*, the claimant becomes depressed before he is disbarred, de-licensed, convicted, etc.). *Id.* Woodall says his depression (factual disability) preceded his disbarment (legal disability), so MMLIC's quest to deny him benefits must fail.

A variety of cases speak to the factual versus legal disability (hence, "before and after") issue, including *Suarez v. Massachusetts Mut. Life Ins. Co.*, 132 F.Supp.2d 1382 (M.D.Ga.) (Insured physician's disability from depression was legal, not factual, and thus not covered by disability or business overhead insurance policies, where depression *followed* insured's arrest for alleged sexual assault of patients and consequent suspension of his medical license; business overhead policy's definition of "regular occupation" as that in which insured was engaged "just before" date of disability did not compel coverage, regardless of short interval between arrest and depression diagnosis, since just *before* disability insured was not licensed to practice medicine), *aff'd*, 232 F.3d 216 (11th Cir.2000) (table), and *Paul Revere Life Ins. Co. v. Bavaro*, 957 F.Supp. 444, 449 (S.D.N.Y.1997) (Under disability policy which entitled insured to benefits for total disability arising "because of" sickness, legal disability arising *subsequent* to disability by reason of sickness, which itself precluded insured from engaging in his occupation, would *not* disentitle insured to disability payments), cited in *Weissman v. First UNUM Life Ins. Co.*, 44 F.Supp.2d 512, 521–22 (S.D.N.Y.1999) (Where motorcycle accident injuries triggered payment of long-term disability benefits under policy defining covered disability as "due to sickness or injury," insured's *subsequent* legal disability consisting of being barred from working in securities industry did *not* terminate insurer's liability under policy); *Gassler v. Monarch Life Ins. Co.*, 303 A.D.2d 364, 755 N.Y.S.2d 660, 660 (N.Y.A.D. 2 Dept. 2003) ("plaintiff was not entitled to disability benefits under the terms of the policies because he was unable to practice podiatry in New York State because of a legal disability, *i.e.*, the revocation of his license, not a factual disability, *i.e.*, depression").

Woodall thus superilluminates the temporal distinction in such cases (*i.e.*, if the medical disability triggers policy coverage first, then the later, legal disability cannot undo it) in arguing against reading into MMLIC's policy the public policy argument MMLIC now urges. Doc. # 28 at 8–14. If MMLC wanted to exclude coverage for post-factual, legal disabilities, he contends, it could have provided for that in its policy contract. *Id.* And coverage exceptions, he emphasizes, are strictly construed, with any ambiguity resolved in favor of the insured. *Id.* at 2–7 (citing, *inter alia, Vulcan Life Ins. Co. v. Davenport*, 191 Ga.App. 79, 380 S.E.2d 751 (1989), *rev'd on other grounds, Allianz Life Ins. Co. of North America v. Riedl*, 264 Ga. 395, 397, 444 S.E.2d 736 (1994)).

▮ Woodall also contends that:

● at most, courts should uphold the insurer's public-policy defense only if

there is evidence that the insured obtained the policy in contemplation of committing the crime or wrongful act, *id.* at 13; and

● federal courts (sitting in diversity) should neither create nor expand state public policy doctrines, Georgia's codified public policy exceptions for contracts do not include this sort of situation,[6] and in any event public policy arguments can rapidly get out of control (*e.g.,* disability coverage could be denied to a motorist injured by an accident caused by his speeding, or running a red light). *Id.* at 18–25.

MMLIC responds by citing *Suarez* as an example of a court that invoked the factual/legal disability distinction despite the absence of a corresponding exclusion in the policy (hence, it invoked a public policy bar). Doc. # 35 at 8–9. *Suarez,* MMLIC says, basically ignores the time-phasing set forth above and agrees that insurers can deny coverage where the disabling depression is traceable back to the wrongdoing that ultimately leads to the legal disability. *Id.* at 10.

*Suarez,* MMLIC further emphasizes, relied upon *Provident Life & Accident Ins. Co. v. Fleischer,* 26 F.Supp.2d 1220, 1225–25 (C.D.Cal.1998), *aff'd,* 18 Fed.Appx. 554, 2001 WL 1002843 (9th Cir.2001). Doc. # 35 at 10–12. The *Fleischer* court reviewed cases upholding insurance benefit denials where the legal disability preceded the claimed factual disability, 26 F.Supp.2d at 1223–25, then noted, with respect to claimant Fleischer's disability claim, that:

> [t]he critical comparison in this case is not between the claimed factual disability in January 1994 and Fleischer's guilty plea and incarceration in September 1995. Rather, the Court must examine the legal consequence of the initiation of the criminal proceedings against Fleischer in June, 1993.

> In this case, the undisputed evidence reveals that Fleischer's illegal activity resulted in his indictment, arrest, and month-long imprisonment in June 1993. Fleischer's illegal conduct and the subsequent criminal proceedings arising directly from that conduct occurred *before* Fleischer's claimed factual disability in January 1994.

26 F.Supp.2d at 1226.

*Fleischer* does not greatly assist MMLIC because claimant Fleischer's wrongful conduct *and* the resulting legal proceedings (which led to his legal disability) began before Fleicher's depression-disability was established, while here only Woodall's wrongful conduct (but *not* the resulting legal disability) occurred before his factual disability (his psychiatrist's 2/97 diagnosis of depression) was established.

Woodall's case thus falls in between the "before and after" cases set forth above. As mentioned *supra,* these facts make this a case of first impression, thus necessitating some deeper theoretical exploration of the public-policy doctrine's central purpose. That exploration is perhaps best undertaken by considering the following hypothetical:

"T.S." is in "waste management." Married with two kids, he's also a crime-family boss. Job and family-life pressures cause depression and anxiety attacks, so he sees a therapist, Dr. M., a Prozac-prescribing psychiatrist.

A savvy sociopath, T.S. operates both legitimate (waste-removal) and illegitimate enterprises (gambling, prostitution, etc.),

---

**6.** The Court rejects Woodall's argument to the extent he contends that only Georgia's legislature generates public policy exceptions in Georgia law. *See Jefferson Pilot Life Ins. Co. v. Clark,* 202 Ga.App. 385, 390, 414 S.E.2d 521 (1991) ("[T]he public policy of this state is created by our Constitution, laws and judicial decisions") (quotes and cites omitted).

and takes out a disability policy with "The Gullible Insurance Company." Upon learning that he's been wiretapped and is about to be indicted for a crime packing a very long prison term, T.S. actually does become depressed to the point where he cannot get out of bed, much less operate his legitimate business any longer.

Dr. M. then credibly certifies that he is so depressed that he is "disabled" from running his legitimate business.[7] T.S. files a depression-based disability claim with The Gullible, which pays out under a reservation of rights letter because, as is the case in Georgia, state law imposes stiff penalties for unreasonable claim-denial. Meanwhile, "the feds" take their time and fail to indict/convict him until months later, in response to which the local municipality revokes his business license.

But Gullible, like MMLIC, failed to expressly exclude against this result in its policy, so it brings an action to deny coverage on public policy grounds, arguing that T.S.'s criminal behavior is inextricably intertwined with the depression supporting his disability claim, and no one should benefit from one's own wrongdoing.

Before the trial court T.S. cites the above-referenced "before and after" cases in demanding coverage. The court rules in his favor because his "medical disability" (his depression) preceded his legal (revoked business license) disability.

Word of the ruling spreads, and T.S.'s associates immediately obtain disability policies that cover depression. After all, they can — with reasonable credence — claim that they are not obtaining them with criminal intent, for all can grow depressed when downwind indictments loom, and thus become "disabled" from operating their own legitimate businesses before any criminal proceedings commence. Nat-

---

7. Lawyers notoriously have had little difficulty in finding mental health professionals to "medicalize" criminality. One of the most outrageous "legal lore" examples involves the so-called "Twinkie Defense":

It all started on November 27, 1978 in San Francisco. Dan White, an ex-policeman who had recently resigned as city supervisor, climbed in the basement window of City Hall to avoid metal detectors, walked upstairs to the office of mayor George Moscone and demanded his supervisor job back. When Moscone refused, White shot him twice at close range, then stood over the body and put two more bullets into the mayor's brain to finish him off. Then he reloaded, went down the hall, and killed Harvey Milk, a popular supervisor who was also America's first openly gay public office holder, shooting him five times.

At trial, White's lawyer argued that he was suffering from "diminished capacity," a controversial defense then permissible in California courts. White supposedly was suffering from depression and thus incapable of premeditated murder. As evidence of this, psychiatrist Martin Blinder testified that the formerly health-conscious White had recently become a junk food junkie. Blinder commented that too much sugar can affect the chemical balance in the brain and worsen depression, but didn't blame the crime on bad diet. Rather, he offered junk food use as proof of White's mental state-in other words, Twinkie consumption was an *effect* rather than the *cause* of White's problems. But the media and public immediately-and misleadingly-dubbed the defense's argument the "Twinkie defense."

Whatever they called it, it worked. The jury found White guilty of a lesser charge, voluntary manslaughter. White was sentenced to six years in prison rather than life as many expected. The gay community and others were outraged, and rioting broke out in San Francisco. Largely in response to this case, California voters in 1982 overwhelmingly approved a proposition to abolish the "diminished capacity" defense. Dan White, for his part, served his time in prison, was paroled in 1985 and committed suicide a few months later.

www.straightdope.com/mailbag/mdimcapacity.html (site as of 8/19/03). Prosecutors have since used the "Twinkie Defense" term to disparage defense efforts to explain away criminal conduct. *See, e.g., State v. Virk,* 105

urally, Dr. M's patient roster grows, while disability insurance rates skyrocket (what cost-effective, practical ways exist to ascertain whether an insurance customer possesses a criminal mind?).

In *The Gullible v. T.S.*, however, the appellate court reverses. It concludes that where legal-disability consequences imminently loom on the "depressed" disability claimant's horizon, and those consequences are inextricably intertwined (causationwise) with the depression-based disability (*i.e.*, the "detection-confrontation-punishment" consequences that result from wrongful conduct are the predominant cause of the disabling depression), the factfinder may disregard, on public policy grounds, the mere fact that the "factual" disability preceded the legal disability.

Citing the Georgia public-policy cases noted *supra*, the court emphasizes that one should not be able to contractually benefit from depression caused by being confronted over one's own wrongdoing, where the consequences of such wrongdoing predominantly drive the disabling depression itself. The *Gullible* court additionally notes that

> [s]uch a rule is in keeping with a long-standing line of cases in which state courts have refused to allow an insured to be indemnified from liability resulting from the insured's intentional causation of an injury. . . . [It thus] support[s] the proposition that allowing an insured to benefit from his intentionally injurious conduct is against public policy.

*Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 692 (2nd Cir.1997) ("In

line with these cases, we will not allow [a depression-disability attorney's] theft of client funds for self gain to trigger his disability income policy due to his loss of earned income following his suspension from the practice of law"). Finally, the court reasons that, where the causation issue is disputed, an issue of fact may remain for resolution at trial.

Consider the same hypothetical except that, just before T.S. learns of the indictment, he endures a car crash that renders him a quadriplegic and thus morbidly depressed, unquestionably disabling him from operating his legitimate business. Here the *Gullible* court rules in his favor because his "medical disability" (his depression) not only preceded his legal (revoked business license) disability, but the imminently expected prosecution and punishment for his criminal misdeeds also were *not* inextricably intertwined with the depression.[8]

 In the instant case Woodall has stipulated that he grew depressed upon being confronted with the consequences of his own grievous wrongdoing — consequences which ultimately led to his flight from Georgia and disbarment:

> [B]eginning in [2/97], [Woodall] became and has remained as of the date this suit was filed [5/29/02], unable to perform the main duties of his occupation and continually has been under a doctor's care by reason of depression and its related effects, *which resulted principally and directly from his being subject to allegations of misconduct in the [Shiggs] case*, which he disputed, and his initial antici-

---

Wash.App. 1011, 2001 WL 210682 at * 5 (Mar. 5, 2001) (unpublished).

8. It would not be an issue if, subsequently, T.S. somehow medically recovered but could not otherwise return to work because of his life imprisonment (*i.e.*, a superceding legal disability sets in). Gullible could, as any other disability insurer can, pursue an indepen-

dent medical examination and discontinue benefits on the grounds that he is not medically disabled. *Cf. Ohio Nat. Life Assur. Corp. v. Crampton*, 822 F.Supp. 1230, 1233 (E.D.Va. 1993) (pointing out that if the convicted-insured got out of prison, "he would [still] remain unable to work in his currently alleged mental state"), *aff'd*, 53 F.3d 328, 1995 WL 265922 (4th Cir.1995) (unpublished opinion).

pation of a reprimand from the State Bar of Georgia.

Doc. # 21 at 1 (footnote omitted; emphasis added).

Woodall thus falls squarely within the first *Gullible* scenario, and there is no issue of fact on that score. His case also is distinguishable from *Walker v. UnumProvident Corp.*, 2002 WL 31474521 at * 5 (D.Minn. Oct. 25, 2002) (unpublished) (fact issue whether medical doctor diagnosed with serious sexual disorders that left him unable to control his impulse to expose himself to females and, as a consequence of various sexual offenses stemming from that disorder, was imprisoned and lost his medical license, was disabled within the meaning of insurer's disability policy; "a reasonable jury could conclude that Plaintiff was unable to perform the substantial and material duties of his occupation and thus that he became disabled long before his medical license was revoked"). Woodall does not allege that his disabling depression in any way caused him to engage in the disbarable wrongs he committed.

Woodall next asks, "[w]ould the same rationale argued by [MMLIC] apply to the disability claim of a motorist who had been injured while exceeding the lawful speed, or running the red light?" Doc. # 28 at 21. Of course, Woodall is mixing apples and oranges here, for his question delves into the mandatory-insurance realm (where insurance is legally required to protect both the individual *and* the public), while here he presents a *voluntary* — insurance policy (protecting only one person, with a much lower public — impact component) under which a wrongdoer is able to contractually orchestrate a benefit violative of public policy.

Other courts, for that matter, have underscored their public-policy delineations with the mandatory-insurance (and thus protection of the public on a mass-scale) factor in mind:

In *Sledge v. Continental Casualty Co.*, 639 So.2d 805, 812 (La.Ct.App.1994), the court held that an automobile policy coverage exclusion for injury or damage arising out of an "act committed in violation of a law or ordinance" could be applied only to acts in violation of criminal law and that normally require specific or general intent. The court observed that a literal application of the policy language "would effectively deny coverage for all acts incidentally and technically constituting an infraction of the statutory 'rules of the road'...." *Id.* Noting that "a policyholder would normally not expect the instant exclusion to control in reference to speeding, running a stop sign, or failing to maintain control," the court declared that the expansive language of the coverage exclusion clearly conflicted with Louisiana's public policy that automobile liability insurance should protect innocent accident victims.

*Allstate Indem. Co. v. Wise*, 818 So.2d 524, 526 (Fla.App.2d Dist.2001) (Automobile liability policy exclusion for injury or damage "which may reasonably be expected to result" from insured's "intentional or criminal acts" did not apply to exclude motorist's personal injury claims arising out of police chase of insured, who was involved in two motor vehicle accidents during the chase; expansive intentional acts exclusion, if strictly applied so that it was effective even if insured did not subjectively intend to injure accident victims, would contravene public policy behind financial responsibility laws), cited in 7 COUCH ON INS. § 109:65 (*Intentional Harm*) (July 2003); *compare Am. Family Mut. Ins. Co. v. Hadley*, 264 Neb. 435, 648 N.W.2d 769, 781 (2002) (Exclusion in personal liability umbrella insurance policy for an injury arising out of conduct for which insured was convicted of negligent child abuse was

not contrary to public policy and could therefore be enforced by insurer).

Woodall's case is easily distinguishable from spontaneous-traffic-infraction cases. His wrongdoing involved deliberate, pre-meditated, calculating conduct that oc-curred over a long period of time. That easily contrasts with a thoughtless incident of "lead-footing" an automobile's accelera-tor pedal, which happens myriad times every day, often with no *mens rea,* and directly imperils others on a mass scale, such that excluding coverage (for a techni-cal criminal violation) would violate public policy.

Finally, the *Vulcan* case, on which Woo-dall relies, doc. # 38 at 8, does not compel a different result here. The issue there was whether a health insurance policy's exclusion for injuries resulting from being "drunk" applied to injuries sustained by an insured injured in a traffic accident; the insured pled guilty to driving under the influence with blood alcohol level of .19. *Vulcan,* 191 Ga.App. at 79–80, 380 S.E.2d 751. The dispute turned on a policy exclu-sion's meaning, because the policy failed to define the word "drunk." *Id.* at 82, 380 S.E.2d 751.

After the insured prevailed, the insurer (Vulcan) appealed and the appeals court rejected

> Vulcan's contention that the verdict and judgment are contrary to the public poli-cy of this state, as expressed by the recent amendment to OCGA § 40–6–391 stiffening penalties for driving under the influence of alcohol. Proof of a violation of this statute does not establish that a driver was "drunk" as required by the policy drafted by Vulcan, which connotes a more substantial degree of impair-ment.

*Vulcan,* 191 Ga.App. at 84, 380 S.E.2d 751.

Thus, *Vulcan* does not in any way sug-gest that Georgia courts would reject the *Gullible* construct here, which is premised on a series of deliberate wrongful acts the consequences of which are inextricably in-tertwined with the factual disability (*i.e.,* the depression resulting from the wrong-doer's realization that he's been confronted and likely will suffer serious consequences over his wrongdoing) at issue in this case. Rather, *Vulcan's* result turned on a policy exclusion's failure to adequately specify what the insurer meant by the word "drunk."

The Court therefore "*Erie* guesses" that in a case like this, Georgia's Supreme Court would conclude that where legal-disability consequences imminently loom on the "depressed" disability benefit claim-ant's horizon, and those consequences are inextricably intertwined (causation-wise) with the depression-based disability (*i.e.,* the "detection-confrontation-punishment" consequences that result from wrongful conduct are the predominant cause of the disabling depression), the factfinder may disregard, on public policy grounds, the mere fact that the "factual" disability pre-ceded the legal disability.

That court therefore would deem benefit payments (and associated premium waiv-ers) to Woodall contrary to public policy. This Court concurs. The remaining issue, then, is *when* did MMLIC effectively re-serve its right to deny such benefits on those grounds?

### 3. MMLIC's Reservation of Rights

 Understandably uncertain (this *is* a first-impression case in Georgia), MMLIC initially paid benefits to Woodall because, like all Georgia insurers, it risked bad-faith penalties if it did not. *See Vul-can,* 191 Ga.App. at 86, 380 S.E.2d 751 (applying O.C.G.A. § 33–4–6); *see also Equicor, Inc. v. Stamey,* 216 Ga.App. 375, 378, 454 S.E.2d 550 (1995) (upholding award under O.C.G.A. § 13–6–11).

Still, nothing legally inhibited MMLIC from bringing a declaratory judgment action earlier (*e.g.,* right after 2/5/01, the date Woodall was disbarred, if not earlier). From 8/30/01 to 3/1/02, MMLIC accompanied its benefit payment checks to Woodall with letters in which it

> reserve[d] all rights under the contract(s). Our review of your claim is continuing and the payment of this benefit does not constitute a waiver on [MMLIC's] part of our right to invoke at any time, any provision contained in your policy or policies.

Doc. # 26, attached "Stipulation" exh. I.

MMLIC thus unquestionably failed to clearly state the basis for its rights reservation in those letters. In a 5/16/01 letter to Woodall, however, its representative wrote that "[d]uring our conversation I explained that the reason your check was issued with reservation of rights was because we had received information which stated that you were disbarred." Doc. # 36 at 14 ¶ 16; # 26, attached "Stipulation" exh. I.

Insurers commonly use rights-reservation letters to reserve their right to (often with the aid of a judicial declaration) deny benefits without facing the risk of a bad-faith penalty as opposed to a mere breach-of-contract finding. *See Morris v. Paul Revere Life Ins. Co.,* 109 Cal.App.4th 966, 135 Cal.Rptr.2d 718, 726 (2003) (An insurer's decision to continue payments under a reservation of rights, rather than cut-off benefits entirely, where it concludes there is no coverage, goes to the issue of damages, not liability on a bad faith theory).

Courts encourage the use of this device. *See, e.g., Colonial Oil Indus., Inc. v. Underwriters (Etc.),* 494CV010 doc. # 88 at 11 (S.D.Ga. Order entered 8/15/95); *Legion Ins. Co. v. Moore,* 846 So.2d 1183, 1186 (Fla.App. 4 Dist.2003) ("In the past it has generally been recognized as prudent, insurance company practice to have coverage resolved as promptly as possible. . . . Insurers almost routinely defend under a reservation of rights, when there is a coverage question, which we encourage") (quotes and cite omitted).

Here MMLIC reserved its right to change its mind and seek a ruling adverse to Woodall — something freely permitted under Georgia law. *See, e.g., Direct Gen. Ins. Co. v. Drawdy,* 258 Ga.App. 149, 151, 572 S.E.2d 629 (2002). MMLIC now says that it investigated and learned that, years into its payment stream, Woodall was disbarred and, as a matter of public policy, he may not recover disability payments. Doc. # 35 at 21–23.

MMLIC, however, is being a little bit coy because, fairly read, the substantive part of its Complaint and briefs is asking the Court to declare that MMLIC can rightly deny *all* payments (hence, before and after Woodall's disbarment) on the public-policy grounds that one can never benefit (even contractually) from his own wrongdoing, and that includes a self-inflicted, "depression" — based disability.

Woodall responds that, even if the Court agrees with MMLIC on its public-policy argument (which the Court has just done, *see supra* Part III(B)(2)), MMLIC nevertheless cannot recover payments that it voluntarily paid prior to its issuance of its rights-reservation letters. The insurer, he insists, knew or should have known about the *Shiggs* facts while making those payments. Doc. # 28 at 21–22; *see also* doc. # 38 at 12. And, Woodall contends, MMLIC's rights-reservation letters never clearly stated on what basis it was reserving its right to challenge payments to Woodall. Doc. # 28 at 22. Nor did the letters warn that MMLIC might seek to recoup pre-letter payments. *Id.*

As MMLIC correctly points out, doc. # 35 at 22, there is very little Georgia law on the effectiveness and scope of rights-

reservation letters, especially in the benefits-policy context (though the Court has found one instance elsewhere, *see Emerling v. Village of Hamburg*, 255 A.D.2d 960, 680 N.Y.S.2d 37, 37–38 (N.Y.App.Div. 1998) (absent express reservation of rights, city could not eliminate retiree medical benefits impliedly promised in return for ten years of employment), and general pronouncements exist encyclopedically, *see* 13 COUCH ON INS. § 195:50 (*Reservation of Rights* ) (July 2003)).

Most of the Georgia case law in this area deals with an insurer's duty to defend its insured from third party claims where the insurer is uncertain of its duty to defend. Cases hold that an insurer may be found to waive its right to refuse to defend where it does not timely issue a rights-reservation letter to its insured. *See* 14 COUCH ON INS § 202:57 (July 2003).

Similarly, a "[p]ayment by an insurer, with knowledge of facts to support a policy defense, amounts to a waiver of the right to rely thereupon or to recover the payment made." 16 COUCH ON INS. § 226:102 *Payment With Knowledge of Facts; Generally* (July 2003).

▇▇ The Court agrees with Woodall that Georgia law requires insurers to timely notify their insureds of their intent to reserve rights, and clearly specify their basis. *See State Farm Mut. Auto. Ins. Co. v. Wheeler*, 160 Ga.App. 523, 527, 287 S.E.2d 281 (1981); *Continental Cas. Co. v. Synalloy Corp.*, 667 F.Supp. 1523–1541 (S.D.Ga.1983). MMLIC did not clearly do so until its 5/16/01 letter (again, Woodall was disbarred on 2/5/01, *see* doc. # 17 ¶ 1; # 36 at 13 ¶ 13).

▇▇ The Court also agrees that the *Shiggs* controversy was fully publicized and not concealed from MMLIC, which fails to support any claim of ignorance with competent evidence. And, though not in this context, it's been said that "[a] general reservation of defenses is wholly ineffec-

tive to prevent a waiver that has already occurred." *Sargent v. Allstate Ins. Co.*, 165 Ga.App. 863, 867, 303 S.E.2d 43 (1983), quoted in 46 C.J.S. INSURANCE § 824 (June 2003).

On balance, Woodall has the better argument here, at least with respect to pre 5/16/01 payments. To claim the right to contest a payment obligation based on having "reserve[d] all rights under the contract(s)" is to claim the right to pretty much do anything. MMLIC knew something was up payment-disqualification wise (it did, after all, send Woodall the rights-reservation letters prior to that date), and nothing stopped it from stating "we think that your own misconduct disqualifies you from collecting disability benefits under Georgia law" in its earlier letters.

▇▇ The Court therefore will apply these rules:

A payment of a claim is deemed voluntary, and the amount paid cannot be recovered, where the facts are all known and no artifice, deception, or fraudulent practice is used by the insured to obtain payment. However, an insurer that is not possessed of all of the facts, and misplaces confidence in the validity of a claim, will not be precluded from recovering proceeds erroneously paid.

16 GA. JUR. INSURANCE § 23:8 (*Recovery Back of Payments by Insurer, Generally* ) (Aug.2002) (footnotes omitted). These rules contain an important qualification:

An insurer cannot recover a payment on the basis of a mistake as to a fact about which there was *some doubt* at the time of payment, particularly where the insurer cannot show any valid reason for failing to ascertain, prior to making payment, the true circumstances surrounding the claim.

*Id.* (footnotes omitted); *see also id.* ("Nor can the insurer recover a payment made through ignorance of the law, rather than by reason of a mistake of fact").

MMLIC therefore reserved its right to terminate disability benefits on 5/16/01 — the date it clearly articulated at least a substantial part of the basis, as accepted here, for denying coverage — but not before that date.

## IV. CONCLUSION

Accordingly, the Court declares that Massachusetts Mutual Life Insurance Company (MMLIC) is excused from paying defendant John T. Woodall further benefits (*i.e.*, after 5/16/01) under the policies specified in its Complaint, but it may not recover from him its pre–5/16/01 payments nor premium waivers. Conversely, it may recover post–5/16/01 benefit payments and premium waivers, while Woodall is not entitled to any benefits or premium-waiver provisions from 5/16/01 onward.

In addition, the Court *OVERRULES* defendant Woodall's objection (doc. # 41)

to MMLIC's reply brief. It *DENIES* Woodall's (jurisdiction/venue-based) summary judgment motion (doc. # 24); *GRANTS IN PART AND DENIES IN PART* MMLIC's cross-motion for partial summary judgment (doc. # 33); and *GRANTS IN PART AND DENIES IN PART* Woodall's (merits-based) summary judgment motion (doc. # 27).

Finally, the parties are directed to confer within 10 days of the date this Order is served and endeavor to in good-faith resolve the remaining issues in this matter (*e.g.*, calculate amounts owed under the above declaration, settle or promptly litigate any remaining issues like MMLIC's attorney-fee claim, *see* doc. # 1 at 16, etc.), with an eye toward jointly presenting the Court with a final judgment closing this case.