**Alfredo E. SUAREZ, Plaintiff,**

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE CO., Defendant.**

**No. Civ.A.5:98CV1773(HL).**

United States District Court,
M.D. Georgia,
Macon Division.

March 13, 2000.

Thomas F. Jarriel, Macon, GA, for Alfredo E. Suarez, plaintiff.

H. Sanders Carter, Jr., Kenton J. Coppage, Atlanta, GA, for Massachusetts Mutual Life Insurance Company, defendant.

LAWSON, District Judge.

This matter having come before the Court on Defendant's Motion for Summary Judgment [Tab 26], and the Court having considered the pleadings, depositions, answers to interrogatories, admissions and affidavits, as well as the briefs of counsel, the Court hereby grants the Motion for the reasons that follow.

**I. FINDINGS OF FACT**

The facts of this case are largely undisputed. In 1994, Alberto Suarez, a family practice physician practicing in Macon, Georgia, obtained three disability insurance policies from Massachusetts Mutual Life Insurance Company ("MassMutual"). The three policies went into effect on April 12, 1994. Two of the three policies were intended to cover loss of earned income caused by disability; the third policy was intended to cover business overhead expenses in the event of a disability.

The disability income policies defined "disability" in the following manner:

Disability, as used in this policy, is an incapacity of the Insured that:

1. Begins while this policy is in force; and

2. Is due to injury or sickness; and

3. Begins when, and continues while, the Insured is receiving timely and appropriate care by or at the direction of a legally qualified physician, unless we are furnished with proof, satisfactory to us, that future care would be of no use; and

4. Reduces the Insured's ability to work; and

5. Causes a Loss of Earned Income, as discussed in this Part.

The business overhead expense policy defined "total disability" in a similar manner:

Total Disability is an incapacity of the Insured that:

1. Begins while the policy is in force; and

2. Is due to injury or sickness; and

3. Begins when, and continues while, the Insured is receiving timely and appropriate care by or at the direction of a legally qualified physician, unless we are furnished with proof, satisfactory to us, that future care would be of no use; and

4. Prevents the Insured from performing the substantial and material duties of the Regular Occupation. In addition, the Insured must not be engaged in any occupation for compensation, wage or profit.

Regular occupation means the occupation in which the insured was regularly engaged just before the date disability began.

During 1994, Suarez was the subject of a law enforcement investigation which led to his indictment, on January 12, 1995, on charges of child molestation and sexual battery, all involving female patients who allegedly were fondled by Suarez during office visits. Suarez was arrested on January 12, 1995, and taken to jail, where he remained until January 13 or January 14, 1995. On March 15, 1995, Suarez was reindicted in a thirty-three count indictment alleging child molestation, sexual battery, aggravated sexual battery, simple battery, and rape.

On January 13, 1995, acting on an emergency basis, the Composite Board of Medical Examiners (the "Board") suspended Suarez's license to practice medicine. In its order of summary suspension, the Board stated that the suspension was based on a repeated pattern of inappropriate sexual conduct with patients. The Board also directed Suarez to undergo a 72–hour mental and physical evaluation. The purpose of the evaluation was to determine whether Suarez had "become unable to practice medicine with reasonable skill and safety to patients by reason of illness or use of alcohol, drugs, narcotics, chemicals, or any other type of material, or as a result of any mental or physical condition." (Suarez Dep., Ex. 8.) Also on January 13, 1995, the Board notified Suarez that a hearing would be held on March 20, 1995, for the purpose of determining whether any disciplinary action should be taken against his license to practice medicine in Georgia.

Pursuant to the Board's directives, Suarez was admitted to the Coliseum Psychiatric Hospital on January 23, 1995, for evaluation. Suarez was seen by James T. Alley, M.D., who was the medical director of the hospital's Addictive Disease Unit. Dr. Alley also arranged for a psychiatric evaluation to be conducted by Bernard M. Williams, M.D., and for a psychological evaluation to be conducted by Don Meck, Ph.D. Suarez was discharged on January 26, 1995. In his discharge summary, Dr. Alley concluded that Suarez suffered from "acute major depression based on current environmental circumstances" and further noted that "no underlying psychiatric/psychologic impairment of any kind could be found." (Def.'s Mot.Summ.J., Ex. 5.) Dr. Alley also assessed Suarez's global func-

tioning level as 50% disabled "due to his present circumstances which he is coping with fairly well." (Def.'s Mot.Summ.J., Ex. 5.) Dr. Alley's assessment was based, in part, on Dr. Williams' diagnoses of Suarez; Dr. Williams' diagnosis assessed Suarez as "Axis I: acute major depressed based on current environmental circumstances" and "Axis V: 50% disabled."[1] (Def.'s Mot.Summ.J., Ex. 6.) Dr. Alley's assessment was also based on Dr. Meck's diagnoses of Suarez; Dr. Meck concluded that Suarez was experiencing "adjustment disorder with depressed mood secondary to current legal conflicts and inability to practice medicine." (Ex. to Alley Dep.) Dr. Meck also noted that Suarez's "current difficulties should resolve if allowed to practice his profession in the future." (Ex. to Alley Dep.)

As a result of his examination of Suarez, Dr. Williams concluded that Suarez's depression was the result of the charges of sexual exploitation that had been brought against him and the loss of his license to practice medicine. (Williams Dep. at 14, 20.) Dr. Williams did not recommend any medication for Suarez because he believed that his condition was "more situational." (Williams Dep. at 16.) Dr. Williams also believed that Suarez would be able to function at his occupation when his license to practice medicine was reinstated and that the only factor which served to foreclose his ability to practice medicine was the fact that he did not have his license. (Williams Dep. at 22–23.) During an office visit on May 25, 1995, Dr. Williams advised Suarez that he was not disabled but, rather, that he was not allowed to practice medicine for legal reasons. (Williams Dep. at 25.)

In June of 1995, Suarez submitted a claim for benefits under the three disability policies to MassMutual. In his claim for benefits, Suarez indicated that he last worked on January 12, 1995, and that he became totally disabled on January 13, 1995. (Suarez Dep., Ex. 4.) Suarez described the nature of his injury or sickness as "major depression, stress syndrome with panic." (Suarez Dep., Ex. 4.) In support of his claim, Suarez submitted the statements of various treating practitioners, including Dr. Alley, John L. Zimmer, M.D., Patricia B. Sapp, M.D., and Donald C. Watkins, Ph.D., all of whom diagnosed Suarez as suffering from depression, with symptoms first appearing on January 14, 1995. (Def.'s Mot.Summ.J., Exs. 7, 8, 9, & 10.)

After evaluating Suarez's claim, MassMutual concluded that Suarez did not have a psychiatric condition of disabling proportions and, therefore, did not meet the definition of disability under the terms of the policies. MassMutual further concluded that Suarez's reduced ability to work was the result of a legal incapacity—the suspension of his license—and not due to a medical incapacity. By letter dated October 2, 1995, MassMutual denied benefits to Suarez.

Suarez eventually entered a best interest plea to the criminal charges brought against him, pleading guilty on one felony offense of child molestation (Count 2) and three misdemeanor offenses of sexual battery (Counts 14, 18, and 30). Sentences were imposed on Suarez on August 19, 1996. On the felony charge, Suarez was sentenced to ten years, to serve one year in the diversion center and the remainder on probation. On the misdemeanor charges, Suarez was sentenced to twelve months probation; all of the sentences were to run concurrent. As a condition of his sentence Suarez was also required to surrender his Georgia medical license.

---

1. The Global Assessment of Functioning Scale assesses psychological, social, and occupational functioning on a continuum of 0 to 100, with a code in the range of 91–100 indicating superior functioning and a code in the range of 1–10 indicating persistent danger of severely hurting oneself or others. A code in the range of 41–50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (Alley Aff., Ex. C.)

Suarez served four months in the diversion center in 1996, during which time he leased certain endoscopy equipment to another physician and was permitted to go to the physician's office to supervise the use of the equipment, clean the equipment and teach the employees how to use it.

On March 6, 1997, the Board accepted Suarez's voluntary surrender of his Georgia license to practice medicine. On October 23, 1997, Suarez applied to the Board to have his license reinstated. That request was apparently denied as Suarez's Georgia license to practice remains suspended. In November and December of 1997, Suarez applied for a medical license in the states of Mississippi, Alabama, Oklahoma, New Mexico, Texas, Arizona, and Kentucky; his applications were rejected. Suarez also applied, unsuccessfully, to work as a physician in the Veteran's Administration hospital system, and in state and federal penal systems.

On June 3, 1998, Suarez filed a Complaint for Damages against MassMutual, alleging that he was wrongfully denied benefits in excess of $360,000. Suarez also alleged bad faith and sought statutory damages in excess of $90,000, plus damages for the loss of his medical practice (which he contends resulted from MassMutual's failure to pay him benefits), plus damages for pain and suffering and severe emotional distress. After engaging in discovery, Mass Mutual filed the Motion at issue here.

## II. CONCLUSIONS OF LAW

In moving for summary judgment, MassMutual argues that Suarez is not disabled under the terms of the relevant policies because his inability to work was not due to injury or sickness but was due to the suspension of his license by the Board. MassMutual points out that in order to engage in his occupation as a medical doctor, Suarez was required to hold a valid medical license and, having had his license suspended on January 13, 1995, he was legally disabled from his regular occupa-

tion on that date. (Mem.Supp. Def.'s Mot. Summ.J. at 14.) MassMutual contends, therefore, that Suarez's legal disability preceded any factual disability which might have occurred on January 14, 1995, and, as such, he is precluded from recovering under the terms of the policy. MassMutual further argues that the depression from which Suarez allegedly suffers is not disabling but merely situational or environmental and that it would end if he were to have his license reinstated.

While generally agreeing with MassMutual that his legal disability preceded his factual disability, Suarez nevertheless maintains that he is entitled to benefits under the terms of the policy. Suarez bases this contention on the definition of "regular occupation" contained within the business overhead policy, which reads: "Regular occupation means the occupation in which the insured was regularly engaged *just before* the date disability began." Suarez argues that this language allows the legal disability to come before the factual disability and apparently contends that because he held a valid medical license through January 12, 1995, he was regularly engaged in the practice of medicine *just before* the date of the disability, so as to be covered by the policy, even though he was no longer a licensed physician by the time the disability arose. Suarez also argues that there are questions of fact with respect to whether he suffered from a disabling injury.

The Court finds Suarez's arguments to be unpersuasive. The undisputed facts of this case show that on January 13, 1995, Suarez lost his license to practice medicine. Therefore, *just before* Suarez's disability allegedly began on January 14, 1995, he was no longer engaged in his regular occupation. Suarez's argument to the contrary—that because only one day intervened between the time he was authorized to practice medicine and the day he became disabled, he was engaged in his regular occupation *just before* the date disability began—is disingenuous because it

asks the Court to ignore those events which intervened between the time he last engaged in his regular occupation and the date his disability began.

Despite the fact that all of the events relevant to Suarez's disability claim occurred within a short time span, the plain language of the policy controls. It is of no consequence that the term *just before* is being applied here to a period encompassing only hours, rather than to a period encompassing perhaps weeks or months. The simple fact is that *just before* Suarez became disabled he had already been prevented by the Board from performing his regular occupation, in that he was no longer licensed to practice medicine, and therefore it was not injury or sickness that prevented him from performing his regular occupation. *See generally Provident Life & Accident Ins. Co. v. Fleischer,* 26 F.Supp.2d 1220 (C.D.Cal.1998) (finding that criminal proceeding arose before factual disability and that policyholder was not entitled to disability benefits), *and Allmerica Financial Life Ins. and Annuity Co. v. Llewellyn,* 139 F.3d 664 (9th Cir.1997) (denying disability benefits because chiropractic license had been revoked the day before disability began and finding, therefore, that chiropractic medicine was not regular occupation at time of disability).

In consideration of the foregoing, the Court finds that Suarez was not disabled under the terms of the applicable policies and, therefore, that he is precluded from recovering disability benefits under these policies. Because the Court concludes that Suarez's regular occupation ceased on January 13, 1995, it is irrelevant to the determination of this case whether Suarez suffered an actual disability beginning on January 14, 1995, and the Court need not consider Suarez's argument that a question of fact exists with respect to whether or not he suffered a disabling injury. Furthermore, because the Court concludes that MassMutual's decision to deny benefits was not wrongful, Suarez's claims for damages for bad faith, loss of his medical practice, and pain and suffering and severe emotional distress cannot be maintained.

## III. CONCLUSION

In view of all of the foregoing, the Court finds that there are no genuine issues of material fact which demand resolution by a trier of fact and Massachusetts Mutual Life Insurance Company is entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgment is hereby granted.