Abdul KOCER, Plaintiff,

v.

NEW YORK LIFE INSURANCE
COMPANY, Defendant.

No. CIV.A. 1:03–CV–1758–.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 24, 2004.

H. Sanders Carter, Jr., and by Aaron E.
Pohlmann of Carter & Ansley, Atlanta,

GA, for defendant, New York Life Insurance Company.

John T. Dufour of VanPelt & Dufour, Carrollton, Georgia, for plaintiff.

## ORDER

COOPER, District Judge.

Pending before the Court are cross motions for summary judgment filed by Defendant New York Life Insurance Company ("Defendant") and Plaintiff Abdul Kocer ("Plaintiff").

## I. BACKGROUND

### A. Plaintiff's Medical Work History

Plaintiff received his medical degree in 1975 from Nangarhar Medical School in Kabul, Afghanistan. After receiving his medical degree, Plaintiff moved to the United States and enrolled in post-graduate courses. From 1984 to 1985, Plaintiff spent his first year of residency at the Area Health Education Center in El Dorado, Arkansas. After completing only one year of residency, Plaintiff obtained a license to practice medicine in Arkansas. During 1986–1988, Plaintiff spent a second year and part of a third year of residency at the University of Mississippi Medical Center in Jackson, Mississippi. Plaintiff left the residency program on June 10, 1988, and was officially dismissed from the program for academic failure by faculty vote effective June 30, 1988. That same year, Plaintiff obtained employment at the VA Medical Center in Miles City, Montana in a position that did not require completion of a three-year residency.

After working at VA Medical Centers in Montana and Nevada, Plaintiff spent six months in the U.S. Army Medical Corps, primarily conducting routine medical examinations of soldiers at Fort Jackson, South Carolina. After Plaintiff was honorably discharged from the army, he worked between 1992 and 1997 as an emergency room physician at a small satellite clinic of St. Edward Medical Center in Waldron, Arkansas. Plaintiff was the only emergency room physician on staff at this facility.

In June 1996, while working at St. Edward's satellite clinic, Plaintiff was sued by two female patients and their husbands, who claimed that Plaintiff had prescribed grossly inappropriate amounts of Stadol and Xanax to the patients, sometimes in the names of others, resulting in their addiction to the drugs. On July 11, 1996, the Arkansas State Medical Board issued an Order and Notice of Hearing, charging Plaintiff with prescribing excessive dangerous, addictive, and potentially harmful medication for non-medical reasons, and trading sex for medication. One of Plaintiff's patients and her husband went to trial on their claims, but a settlement was reached before a verdict was rendered. A subsequent suit against Plaintiff by the second patient and her husband was also later settled out of court.

Plaintiff's employment contract with St. Edward expired on June 15, 1997, and his contract was not renewed by the hospital. For the next couple of years, Plaintiff worked for multiple locum tenens companies, acting as a temporary substitute physician at different facilities. At no time during this period was Plaintiff employed on a permanent basis at any medical clinic or hospital, and he did any type of medical work he could find, including working in emergency rooms, at a "rehab clinic," and at a weight loss clinic. Deposition of Abdul Kocer (hereinafter "Plaintiff's Depo."), p. 66. In February 1998, one of the companies for which Plaintiff performed locum tenens work, Fischer Mangold, terminated Plaintiff's contract.

On April 8, 1999, the Arkansas State Medical Board found that Plaintiff had committed multiple violations of Ark.Code Ann. § 17–95–409(a)(2)(G), in that he had

exhibited gross negligence and ignorant malpractice by prescribing excessive amounts of Stadol to three patients, by engaging in sexual relations with a patient, by providing Stadol in exchange for sexual relations, and by prescribing medication for non-medical reasons. In an order entered on April 22, 1999, the Board revoked Plaintiff's license to practice medicine in Arkansas.

### B. *Disability Insurance Policy*

Defendant issued Group Policy No. G–7201 (the "group policy"), a policy of disability insurance, to the American Academy of Family Physicians ("AAFP"). As a member of the AAFP, Plaintiff purchased coverage under the group policy effective September 1, 1997. Under the group policy, "Covered Total Disability" is defined in pertinent part as "an incapacity from ... an INJURY or SICKNESS ..., but only if such incapacity completely and continuously prevents the INSURED MEMBER from doing the material and substantial duties of his or her occupation, provided he or she is not engaged in any occupation for pay or profit ...." Plaintiff's Depo., Ex. 5, p. 4. "Covered Residual Disability" is defined in pertinent part as "an incapacity from an INJURY or SICKNESS that ... occurs when an INSURED MEMBER returns to work following a period during which he or she suffered a Covered Total Disability of at least 30 days; ... [and] prevents the INSURED MEMBER from earning more than 75% of his or her AVERAGE MONTHLY INCOME for the period before his or her Covered Total Disability ...." *Id.* at p. 5. Average monthly income" is defined to mean "as of any date, a person's average monthly wages, salaries, commissions, fees and any other amounts received by such person for personal services...." *Id.* at p. 9. The group policy expressly excludes from coverage "any period of disability for which the INSURED MEMBER is not under the regular care and attendance of a doctor." *Id.* at pp. 5–6. Before disability benefits were payable, the group policy imposed the following requirements:

1. New York Life must receive satisfactory proof of the INSURED MEMBER'S disability within six months after the (a) WAITING PERIOD for a Covered Disability; or (b) date of return from work for a residual disability. If it is not possible to furnish proof within such time, it must be furnished as soon as reasonably possible;

2. New York Life must determine that the disability is a Covered Disability; and

3. for a Covered Disability, the INSURED MEMBER must complete the WAITING PERIOD.

*Id.* at p. 6. "Waiting period" is defined as "the initial continuous period of an INSURED MEMBER'S Covered Total Disability which must be completed before such Covered Total Disability benefits become initially payable. The WAITING PERIOD is stated on the Schedule pages." *Id.* at p. 11. Plaintiff's waiting period was 90 days. *Id.*, Individual Schedule of Benefits. The limitation of action clause of the policy provides that the claimant could not start any legal action more than three years after a claim form or proof of loss is due. *Id.* at p. 2.

### C. *Plaintiff's Disability Claims*

On July 15, 1999, AAFP received a claim form from Plaintiff dated July 4, 1999 in which Plaintiff claimed that he was unable to practice medicine and was totally disabled because he had "contract[ed][the] communicable disease ... Hepatitis B." Plaintiff's Depo., Ex. 40. Plaintiff mentioned no other basis for his claim of disability. Plaintiff described himself as self-employed, and he identified the duties of his occupation as (1) "family physician," (2) performing "ER coverage," and (3) "office [patient] care." *Id.* Plaintiff further

claimed that he had been unable to work due to hepatitis B since "February–March 1999." *Id.* At the time of this claim, Plaintiff resided in Greenwood, Arkansas.

On September 1, 1999, a month and a half after receiving Plaintiff's claim based upon hepatitis B, AAFP received a second claim form dated July 30, 1999, in which Plaintiff reported that he had been unable to work since "February–March–almost January 1999," and that he was "under psych Rx therapy." *Id.* at Ex. 41. On his second claim, Plaintiff described the duties of his occupation as (1) "family practice," (2) performing "ER coverage," (3) "office," (4) "walk in clinic," and (5) "[patient] care." *Id.* The second claim form was accompanied by an Attending Physician's Statement signed by Carol Phillips, M.D., a psychiatrist at the VA Hospital in Fayetteville, Arkansas, dated August 23, 1999. Dr. Phillips reported a diagnosis of "major depression, single episode, severe, not psychotic," and noted subjective symptoms of "loss of interest, initiative, concentration, social withdrawal, poor concentration, anhedonia, crying spells, low self esteem, depressed mood, [and] ruminations of guilt." *Id.*, Ex. 42. Dr. Phillips indicated that Plaintiff was totally disabled beginning January 1999, and that Plaintiff had moderate to marked limitations. Dr. Phillips also noted that she had first seen Plaintiff a month earlier on July 22, 1999.

Defendant received both of Plaintiff's claim forms, along with the Attending Physician's Statement, from AAFP on September 8, 1999. By letter dated September 29, 1999, Defendant requested additional information from plaintiff, including (1) the name and address of the office where he practiced before the onset of disability, (2)

the number of hours he worked per week, (3) the names of doctors he consulted before seeing Dr. Phillips, and (4) his W-2 forms and federal income tax returns for 1997 and 1998 with all supporting schedules. Plaintiff provided some additional information, but he did not produce his tax returns, which were needed to determine his pre-disability income in the event Plaintiff was otherwise eligible for residual disability benefits.[1] Also on September 29, 1999, Defendant wrote to Dr. Phillips requesting psychological evaluation forms and copies of her records pertaining to Plaintiff. Dr. Phillips returned the evaluation forms, dated October 12, 1999, in which she noted that Plaintiff had "major depression, single episode," marital conflicts, and economic problems, with symptoms of anxiety, moderate depressed mood and affect, and worrying about his ability to care for patients and to meet the needs of his home.[2] Defendant's Motion for Summary Judgment, Ex. 3., pp. 65–74. Dr. Phillips also noted that Plaintiff's initial office visit was on July 22, 1999, that she had seen Plaintiff a total of three times, and that Plaintiff had since moved to Georgia. *Id.*

Sometime between the alleged onset of his symptoms of depression in January–February–March 1999 and September 1999, Plaintiff traveled to Georgia a couple of times to look at a weight loss clinic that an acquaintance of his intended to open in Fort Oglethorpe, Georgia. In September 1999, less than two months after he first saw Dr. Phillips, Plaintiff moved to Georgia and began working at the weight loss clinic as a physician on either September 1 or 15, 1999.[3] The clinic in Fort Oglethorpe was primarily a walk-in facility which oper-

1. While Plaintiff provided copies of his 1099 forms from 1998, he did not produce his tax returns to Defendant until the discovery period in this case.

2. On the Hamilton Depression Rating Scale Form completed by Dr. Phillips, Dr. Phillips assigned Plaintiff a score of 39, which indicates severe depression.

3. Plaintiff was able to work at the clinic be-

ated under the name of RX Clinic. The clinic was open for business Tuesday through Saturday from 9:00 a.m. until 3:00 or 4:00 p.m. Plaintiff and another physician worked at the clinic part-time. Plaintiff worked at the RX Clinic for three to six months, but resigned due to a disagreement he had with the manager over whether he had an ownership interest in the clinic.

Approximately one to three weeks after he resigned from the RX Clinic, Plaintiff began working as a physician at another weight loss clinic, Physician's Wellness Centers, Inc., in Marietta, Georgia. Plaintiff was employed there as a full time physician at a salary of $80,000 per year. Plaintiff was the only physician employed at Physician's Wellness Centers, which was open five to seven days a week from 9:00 a.m. to 4:00 p.m. Plaintiff left Physicians Wellness Centers after three or four months due to "a lot of disagreement and a lot of problem[s] with the clinic." Plaintiff's Depo., pp. 70–73.

After Defendant received Plaintiff's medical records and the evaluation forms completed by Dr. Phillips, those materials were referred to an independent psychiatrist, Kenneth M. Berc, M.D., for evaluation. In a telephone conversation with Dr. Phillips, Dr. Berc asked whether Plaintiff "ever mentioned his difficulties with the State Board," to which Dr. Phillips responded that "he had not." Defendant's Motion for Summary Judgment, Ex. 3, p. 40. In this same conversation, Dr. Berc asked whether "at the time [Plaintiff] left for Georgia, his mental status would have been sufficient for the return to the prac-

tice of medicine," to which Dr. Phillips replied that "[Plaintiff] could practice," and that while she "did not feel his mental status was clear enough to allow him to function in such a high stress job as say an invasive cardiologist, ... he certainly could do general medical office work and minor surgery (such as cutdowns, implanting IV's and venous lines, etc."). *Id.* Based upon the information from Dr. Phillips, Dr. Berc had the following impression of Plaintiff's condition:

> Assuming that the claimant experienced loss of his license as catastrophic, a significant depressive type reaction could have followed. His history of fears of transmission of Tuberculosis or Hepatitis as cause for becoming depressed and then closing his office are clearly deceptive. It would be reasonable to give the claimant the benefit of the doubt, based on Dr. Phillips' mental status observation, and say that from 6/24/99 until 7/30/99 his psychomotor slowing related to that depression presented significant limitation for the practice of medicine in general. However, after that date he began to travel and visit others. Although he did not clarify with his doctor, how he came to have the job he left for, it is reasonable to speculate that his trip to Utah and second trip 2 weeks later somewhere were evidence of his ability to seek a new medical position. It would be quite reasonable for psychopharmacological treatment to cause improvement during such a 6 week period of time. He had no significant limitations by mid August which would have interfered with his job in Georgia.

cause, at some point after he received his Arkansas medical license, Plaintiff also became licensed to practice medicine in Georgia, as well as in Utah. When he moved to Georgia, Plaintiff did not report the revocation of his Arkansas license to the Georgia Composite State Board of Medical Examiners. However, a petition by the Utah Division of Occupational and Professional Licensing dated September 23, 1999, shows that sanctions against Plaintiff's Utah license were already being sought based on the findings of the Arkansas Board. In April of 2000, Plaintiff entered into a stipulation agreeing to allow his Utah license to expire effective April 30, 2000.

On December 2, 1999, Defendant sent a letter to Plaintiff requesting that he identify the substantial duties of his occupation prior to the onset of his disability, identify how his medical condition was interfering with the performance of his job, identify why he had returned to work on a part-time basis, and identify the duties of the part-time job and the number of hours per week he was working. Plaintiff responded to these questions and returned the information to Defendant. In his response, Plaintiff informed Defendant that he was working temporarily to help him with his depression.

By letter dated February 22, 2000, Defendant informed Plaintiff that he had not satisfied the terms and conditions of the group policy for a covered disability. After summarizing the applicable terms of the policy and noting that Plaintiff had selected a 90–day waiting period, Defendant informed Plaintiff that July 22, 1999 had been established as the date on which Plaintiff's disability commenced because the group policy excluded periods of disability for which the insured member was not under the regular care of a physician. Because Plaintiff had returned to work by September 15, 1999, Defendant stated that Plaintiff did not have a Covered Total Disability because he did not satisfy the 90-day waiting period. Defendant also determined that Plaintiff did not have a Covered Residual Disability because it did not appear from the information available that Plaintiff had an impairment that prevented him from earning more than 80%[4] of his Average Monthly Income.

### D. Events After the Denial of Plaintiff's Disability Claims

In late 2000 or early 2001, Plaintiff opened his own weight loss clinic, called DX Medical Center, where he worked for approximately six to eight months until June or July 2001. At the DX Medical Clinic, Plaintiff saw 10 to 15 patients per day.

On July 13, 2001, a search warrant was executed at Plaintiff's weight loss clinic, and numerous boxes of alprazolam and hydrocodone and business records related to the purchase and sale of those drugs were seized, based on probable cause to believe that Plaintiff was distributing controlled substances without authorization. On November 9, 2001, Plaintiff entered into a Consent Order for Voluntary Surrender with the Georgia State Board of Medical Examiners, pursuant to which Plaintiff surrendered his license to practice medicine in Georgia based upon the sanctions previously imposed against him in Arkansas and Utah. In December 2001, Plaintiff was indicted in the United States District Court for the Eastern District of Tennessee for conspiring to distribute without authority hydrocodone and alphazolam. On January 23, 2002, Plaintiff entered into a plea agreement pursuant to which he agreed to plead guilty to one count of conspiring to distribute controlled substances without authorization.

Plaintiff originally filed this action in the Superior Court of Cobb County, Georgia on April 17, 2003, seeking to recover total and residual disability benefits under the group policy. Defendant removed the action to this Court on June 24, 2003. Following discovery, both parties filed motions for summary judgment.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

4. The 80% amount is clearly an error because the group policy states that the insured must be prevented from earning more than 75% of his average monthly income.

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). Rule 56 "[b]y its very terms, ... provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–8, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). The materiality of facts is governed by the substantive law. *Id.* at 248, 106 S.Ct. at 2510. A dispute is genuine if the evidence is such that the factual issues may reasonably be resolved in favor of either party. *Id.* at 250, 106 S.Ct. 2505.[5]

### B. *Plaintiff's Claim for Total Disability Benefits*

As set forth above, under the group policy, a Covered Total Disability is an incapacity from an injury or sickness if such incapacity completely and continuously prevents the insured from performing the material and substantial duties of his occupation, provided that he is not engaged in any occupation for pay or profit. Before total disability benefits are payable, a claimant must satisfy the waiting period, which is the initial continuous period of Covered Total Disability which must be completed before Covered Total Disability benefits initially become payable.

■ In the present case, it is undisputed that Plaintiff's waiting period was 90 days. Plaintiff has also admitted that Dr. Phillips was the first physician who provided regular care for his depression, and that her care began when Plaintiff first saw her on July 22, 1999. Because the group policy expressly excludes from coverage any period of disability for which the insured is not under the regular care and attendance of a doctor, Plaintiff's 90–day waiting period could not have started before July 22, 1999. Insofar as Plaintiff had resumed working as a doctor in Georgia by September 15, 1999, less than two months after he first saw Dr. Phillips, he did not satisfy the waiting period requirement of the group policy. Indeed, Plaintiff has admitted that he did not satisfy the 90–day waiting period required for total disability benefits. As such, Plaintiff was not eligible for total disability benefits, and his claim for such benefits fails.[6]

### C. *Plaintiff's Claim for Residual Disability Benefits*

■ Under the group policy, a claimant has a Covered Residual Disability if he has an incapacity from an injury or sickness that occurs when he returns to work following a period during which he suffered a Covered Total Disability of at least 30 days, and the injury or sickness prevents the insured from earning more than 75% of his or her average monthly income for the period before his Covered Total Disability. In the present case, the Court finds that Plaintiff did not have a Covered Residual Disability because he did not have a Covered Total Disability for 30 days before he returned to work in September 1999.

Plaintiff was living in Arkansas when he first consulted Dr. Phillips in July of 1999, and when he submitted his claims for disability benefits. Plaintiff's license to prac-

---

**5.** "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Joplin v. Bias,* 631 F.2d 1235, 1237 (5th Cir. 1980).

**6.** The Court also notes here that in his cross motion for summary judgment, Plaintiff focuses primarily on his claim for residual benefits.

tice medicine had been revoked by the Arkansas State Medical Board three months earlier, in April of 1999. As such, Plaintiff was under a legal disability from practicing medicine in Arkansas at the time he submitted his claims for benefits.

Plaintiff argues that even though his Arkansas medical license had been revoked, he was not legally disabled from practicing medicine because he still had valid licenses to practice medicine in Utah and Georgia at the time he submitted his claims for benefits. However, as stated above, Plaintiff resided in Arkansas at the time he submitted his benefit claims, and he had not yet secured employment as a physician in Georgia. Plaintiff did not move to Georgia and resume the practice of medicine until approximately September 15, 1999. At the time he submitted his claims for benefits, Plaintiff resided in Arkansas and was prevented from performing his occupation as a result of the revocation of his Arkansas license several months before he submitted his disability claims. Where Plaintiff's legal disability preceded his factual disability, he cannot recover benefits under the group policy. *See Suarez v. Massachusetts Mut. Life Ins. Co.*, 132 F.Supp.2d 1382 (M.D.Ga.), *aff'd*, 232 F.3d 216 (11th Cir.2000); *see also, Allmerica Financial Life Ins. and Annuity Co. v. Llewellyn*, 139 F.3d 664 (9th Cir.1997).

■ In addition, Plaintiff failed to show that when he moved to Georgia he was

prevented from earning more than 75% of his pre-disability income after he returned to work. While in his summary judgment motion Plaintiff argues that his pre-disability occupation was as an emergency room physician, the evidence demonstrates that prior to his disability Plaintiff worked in numerous other medical positions besides an emergency room doctor. Indeed, on his claim for benefits, Plaintiff described the duties of his occupation as (1) "family practice", (2) performing "ER coverage," (3) "office [patient] care," (4) "office," (5) "walk in clinic," and (6) "[patient] care." The evidence in the record further confirms that in the two years preceding his factual disability, Plaintiff worked for multiple *locum tenens* companies acting as a temporary substitute physician in different facilities, and at no time during this period was Plaintiff employed on a permanent basis at any medical facility. Instead, Plaintiff did any work he could find, including working at a rehab clinic and a weight loss clinic. Thus, while Plaintiff worked in an emergency room between 1992 and 1997,[7] his occupation could not solely be described as an emergency room physician at the time he submitted his claims for benefits.[8] According to Dr. Phillips, Plaintiff's treating physician, at the time Plaintiff left for Georgia, Plaintiff could practice medicine and could perform general medical office work as he admittedly had done prior to his disability.[9]

■ Furthermore, Plaintiff's claim for residual benefits is barred by the group

---

**7.** Prior to his work as an emergency room physician, Plaintiff worked as a director of an outpatient clinic in Montana and he conducted routine medical examinations of soldiers for the U.S. Army Medical Corps.

**8.** In response to Defendant's request for additional information regarding the specific duties of his occupation, Plaintiff indicated that he spent 90% of his time as an Emergency Room physician. However, as Plaintiff admits that he did any type of medical work

he could find in the two years prior to his disability, such a characterization by Plaintiff is clearly less than accurate.

**9.** With respect to Plaintiff's contention that his tax records demonstrate that his disability prevented him from earning at least 75% of his pre-disability income, the drop in Plaintiff's income between 1998, the last full year before the onset of his disability, and 1999 is most likely attributable to the revocation of his Arkansas license in April 1999 and his

policy's three-year contractual period of limitation. Under the terms of the group policy, a claimant is precluded from initiating any legal action more than three years after a claim form or proof of loss is due. Satisfactory proof of loss must be received by Defendant within six months after the date of return to work for a residual disability. As stated above, Plaintiff returned to work as a physician on approximately September 15, 1999. Proof of loss was thus required to be provided by March 15, 2000, six months after Plaintiff returned to work. Therefore, any legal action for residual disability benefits was required to be initiated by March 15, 2003, three years later.[10] Because Plaintiff did not filed this action until April 17, 2003, his claim for

residual benefits is barred by the terms of the group policy. *See Dailey v. Cotton States Mut. Ins. Co.*, 207 Ga.App. 139, 427 S.E.2d 109 (1993) (contractual limitation periods are valid and should be enforced by the courts).[11]

### III. *CONCLUSION*

For the above-stated reasons, Defendant's Motion for Summary Judgment [10–1] is GRANTED, and Plaintiff's Cross Motion for Summary Judgment [17–1] is DENIED. This action is hereby DISMISSED.

resignation from his positions at two different medical clinics due to disagreements with the personnel and/or about the operation of the clinics.

**10.** Plaintiff's contention that proof of loss for residual benefits was due within six months after the waiting period for a covered disability is without merit. By its express terms, the definition of "waiting period" applies only to claims for total disability benefits, and Plaintiff himself argues that the 90–day waiting period does not apply to residual disability

benefits. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment, pp. 16–17.

**11.** The fact that Plaintiff's current treating physician opined on November 21, 2003 that Plaintiff is totally disabled is of no consequence to this case because Plaintiff has been under a complete legal disability from the practice of medicine since he surrendered his last remaining medical license in November 2001.